707 A.2d 1000

DR. MYRON A. MEHLMAN, PLAINTIFF–RESPONDENT, v. MOBIL OIL CORPORATION, A NEW YORK CORPORATION, DEFENDANT AND THIRD–PARTY PLAINTIFF–APPELLANT, AND F.M. CUNNINGHAM, C.R. MACKERER, IRIS KAPLAN, NORMAN MORGAN AND K.A. TORTORIELLO, DEFENDANTS–APPELLANTS, v. PRINCETON SCIENTIFIC PUBLISHING CO., INC., THIRD–PARTY DEFENDANT.

Argued September 9, 1997—Decided March 26, 1998.

164

*William J. Brennan, III,* argued the cause for appellants (*Smith, Stratton, Wise, Heher & Brennan,* attorneys).

*Neil M. Mullin,* argued the cause for respondent (*Smith Mullin,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

The primary question presented by this appeal is whether the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8 (CEPA), protects an employee from retaliatory action taken against him in New Jersey by his New Jersey employer because the employee objected to a practice that he reasonably believed was incompatible with a clear mandate of public policy designed to protect the public health and safety of citizens of another country.

A threshold issue is whether the evidence adduced at trial was sufficient to satisfy plaintiff's burden of proving the existence of a clear mandate of public policy. Collaterally, we also address whether in CEPA litigation the existence of a clear mandate of public policy is a fact question for the jury or a legal issue for the court and, if the latter, whether this trial court's failure to instruct the jury on whether the evidence at trial established the existence of a clear mandate of public policy constitutes error mandating reversal of the jury verdict and award of damages on the CEPA claim.

Those and other issues raised by Mobil Oil Corporation (Mobil) in its petition for certification and appeal as of right, see *Rule* 2:2–1(a), relate to the claim of respondent, Dr. Myron A. Mehlman (Mehlman), formerly Mobil's Director of Toxicology and Manager of its Environmental Health and Science Laboratory, that Mobil had discharged him in November 1989, in retaliation for his objection to the sale by Mobil Sekiyu Kabushiki Kaisha (MSKK), Mobil's Japanese subsidiary, of gasoline containing levels of benzene in excess of five percent. Mehlman sued Mobil alleging, among other claims, that Mobil fired him in violation of the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8. After a ten-day trial, a jury returned a verdict for Mehlman on his CEPA claim and awarded him $3,440,300 in compensatory damages and $3,500,000 in punitive damages. The trial court granted Mobil's motion for judgment notwithstanding the verdict pursuant to *Rule* 4:40–2(b), concluding that Mehlman had not proved the existence of a clear mandate of public policy that he reasonably believed Mobil had violated, as required by CEPA. See *N.J.S.A.* 34:19–3c(3). Although the trial court vacated the compensatory damages award, on Mehlman's motion the court amended the complaint to conform to evidence supporting a *prima facie* tort claim, entering judgment for Mehlman on that claim and on that basis sustaining only Mehlman's punitive damages award.

In a published opinion, the Appellate Division vacated the judgment on the *prima facie* tort claim on the ground that it was

precluded by CEPA's waiver-of-claim provision, *N.J.S.A.* 34:19–8. 291 *N.J.Super.* 98, 137–38, 676 *A.*2d 1143 (1996). The court reinstated the jury verdict and the compensatory as well as punitive damages awards on the CEPA claim, concluding that the proofs "amply demonstrate that Mehlman identified a clear mandate of public policy which he reasonably believed that Mobil had violated when he objected in September 1989 to the distribution in Japan of gasoline with an excessive benzene content by Mobil subsidiary MSKK." *Id.* at 130, 144, 676 *A.*2d 1143. The court also reversed the pre-trial dismissal of Mehlman's defamation claim and remanded that claim for trial, concluding that that claim was not barred by CEPA's waiver provision because it was based on proofs different from those required to establish the CEPA claim. *Id.* at 142, 144, 676 *A.*2d 1143.

We granted Mobil's petition for certification, 147 *N.J.* 264, 686 *A.*2d 764 (1996), and in resolving the issues presented by that petition we also address the questions that Mobil asserts as the basis for its appeal as of right.

I

A

·Respondent Mehlman is a renowned toxicologist with impressive academic credentials and substantial working experience in toxicology on behalf of both governmental and commercial employers. After completing his Ph.D. degree at the Massachusetts Institute of Technology and a post-doctoral fellowship at the University of Wisconsin, he held faculty positions in biochemistry at Rutgers University and the University of Nebraska. Before joining Mobil he served as Chief of Biochemical Toxicology for the Bureau of Foods, United States Food and Drug Administration, and held other responsible toxicological positions in the United States Department of Health, Education and Welfare and in the Office of the Director of the National Institute of Health.

Mehlman joined Mobil's Medical Department in 1976 as Director of Environmental Health and Toxicology. In 1978 he became Mobil's Director of Toxicology, and in the early 1980s became manager of its Environmental Health and Science Laboratory, which had full responsibility for Mobil's toxicology testing. A 1988 job description indicated that Mehlman's position required an "established international reputation in toxicology and environmental science," and characterized his primary function as "represent[ing] Mobil on toxicology matters, and provid[ing] toxicologic and regulatory advice for prudent business decisions." Mehlman's major responsibilities included the representation of Mobil's interests before regulatory agencies, trade and scientific associations, and academic institutions; approval of protocols for and monitoring quality of toxicity testing; and informing Mobil of pending developments in toxicology regulations that could affect Mobil's worldwide business. The record clearly demonstrated that Mehlman's responsibilities as Mobil's Director of Toxicology were broad and of international scope.

Mehlman's expertise in toxicology and biomedical science is also reflected by his authorship of approximately 200 articles and books on those subjects. His publications include several articles on the subject of benzene toxicity, and he chaired several symposia focusing on the harmful effects of gasoline vapors. He also served as President of the American College of Toxicology.

Prior to his discharge in November 1989, Mehlman's job evaluations were uniformly positive. He received annual merit raises and stock option awards. In May 1989, Mobil's Vice President for Research nominated Mehlman for membership in the National Academy of Sciences, describing him as "an international expert in toxicology [who] is often consulted on issues involving the toxicity of chemicals in relation to environmental health."

The event that allegedly provoked Mehlman's discharge occurred in September 1989, during a trip to Japan. Mehlman traveled to Japan to represent Mobil at an international symposium on "Industrialization and Emerging Environmental Health

Issues: Risk Assessment and Risk Management." Because he was attending the symposium, Mehlman was also invited to address a group of managers at MSKK, Mobil's Japanese subsidiary, on current toxicology and environmental health issues.

Mehlman's presentation to the MSKK managers took place at Mobil headquarters in Tokyo on September 27, 1989. His topic, selected by MSKK's management, concerned the health hazards of human exposure to gasoline. Mehlman's presentation included the use of slides. During his presentation he displayed a slide that showed the volume concentration of benzene, a dangerous and toxic chemical used as an additive in gasoline, as a percentage of regular and premium gasoline content in the United States, Japan, and Europe. MSKK Technical Manager Takashi Tsunemori interrupted Mehlman and asked to see that slide again. When the slide was displayed, showing a range of benzene concentration of 2.5 to 3.5 percent in gasoline sold in Japan for regular gasoline and 2.5 to 4.6 percent for premium gasoline, Tsunemori allegedly informed Mehlman that the slide was incorrect because the benzene content in MSKK's regular gasoline was 5.7 or 5.8 percent.

Mehlman responded that "we, in [the] United States and at Mobil[,] consider benzene as a very poisonous chemical—dangerous and toxic. And [these] concentrations are too high. [T]hey have to be reduced." In response to Mehlman's inquiry, Tsunemori stated that MSKK was not required to inform Japanese regulatory officials of their gasoline's benzene content. When Mehlman insisted that the benzene level "is much too dangerous and you must reduce it," Tsunemori's response, according to Mehlman, was that "[w]e have old equipment and we cannot do that because it will cost us several hundred million dollars to change that single refinery to produce a product with low levels of benzene." Mehlman replied: "You reduce it or do not sell it," and he described the reaction of the other MSKK managers as "stunned, shocked and surprised."

Tsunemori testified at trial as a witness for Mobil and denied that he had informed Mehlman during his September 1989 presen-

tation to Mobil managers that the benzene content of MSKK's gasoline was 5.7 or 5.8 percent. He testified that he recalled no "meaningful" discussion during Mehlman's presentation, took no notes, and made no report to his superior. Tsunemori also testified that in the summer of 1989 the benzene content in regular gasoline from the three Japanese refineries that supplied MSKK was 2.1 percent, 2.9 percent, and 4.5 percent. On cross-examination Tsunemori acknowledged that the average benzene level in MSKK gasoline in November and December 1989 was 4.9 percent, and that in December the benzene level ranged from 4.5 to 5 percent.

Shortly after his presentation at MSKK, Mehlman left Tokyo and traveled to Kitayushu, Japan, where he attended the First Pacific Cooperative Symposium from October 1 to October 5. Mehlman gave the same slide presentation at that conference as he had given to the MSKK managers, but because the audience included regulators and Mobil competitors he merely noted that the actual benzene levels in Japanese gasoline are somewhat higher than those shown on the slide. Mehlman testified that he intended to discuss the problem of high benzene levels in MSKK gasoline with his superiors upon his return from Japan.

Mehlman returned from Japan late on Friday, October 6, 1989, and was informed that Anthony Silvestri, a Vice President of Mobil Research and Development and Mehlman's immediate superior, wanted Mehlman to call him. Mehlman telephoned Silvestri on the morning of October 7. Silvestri read a prepared statement to Mehlman in which he informed him that he was immediately being placed on special assignment indefinitely because of a pending investigation that had revealed a possible conflict of interest between Mehlman's responsibilities to Mobil and his activities on behalf of his wife's company, Princeton Scientific Publishing Company (Princeton Scientific). Silvestri told Mehlman that he was not permitted to appear at his laboratory while on special assignment and was expressly instructed "not to call anyone at the lab." Although Mehlman attempted to respond,

Silvestri stated that no response would be permitted, and testified to his concern that Mehlman was taping the conversation. Silvestri also testified that at that time he had no knowledge or information concerning Mehlman's remarks to the MSKK managers about the benzene content of MSKK gasoline.

From October 7, 1989, through November 20, 1989, the effective date of Mehlman's discharge by Mobil, Mehlman was not permitted to return to his laboratory or to have any contact with Mobil employees. During that period, Mobil's security personnel completed an investigation of Mehlman that had been authorized by Joseph D'Ambrisi, Silvestri's immediate superior and Mobil Vice President of Research and Engineering. According to Mobil's witnesses, that investigation had been triggered by a telephone call on September 20 or 21 from Kymm Rutigliano, owner of a consulting firm hired by Mobil to improve employee communications in Mehlman's laboratory, to Silvestri informing him of reports that Mehlman was misusing Mobil assets for personal gain. According to Silvestri and Rutigliano, Silvestri immediately instructed Rutigliano to prepare a report on that subject and deliver it to him by September 28. Rutigliano delivered the report at 1:00 p.m. on September 28, but acknowledged that she "pulled an all nighter" the night before to get it done. On receiving that report, Silvestri immediately delivered it to D'Ambrisi, who in turn ordered a more detailed internal investigation of Mehlman.

On October 12, 1989, while that investigation was in progress, Mehlman attended a meeting where for the first time he heard a summary of the allegations against him. The Appellate Division opinion describes that meeting:

> On October 12, Silvestri met with Mehlman and personnel employee Gary Habla to review the allegations and to give Mehlman an opportunity to respond. Silvestri told Mehlman that he was accused of relying on his subordinates to examine papers for Princeton Scientific; employing Mobil's mail system to send out Princeton Scientific books and documents; spending Mobil's petty cash on stamps for Princeton Scientific; utilizing the services of Mobil's personnel for Princeton Scientific; using Mobil's materials and graphics equipment for brochures for Princeton Scientific; paying honoraria to laboratory visitors when they provided services for Princeton Scientific; providing Mobil grants to people who were doing

things for Mehlman; and, submitting irregular travel and entertaining expense account forms. Mehlman denied some of the allegations and had no comment on others. Mehlman was neither given a written copy of the Rutigliano report nor allowed access to the laboratory to obtain records pertinent to the investigation. Instead, another meeting was scheduled for October 24 to afford Mehlman, with his attorney present, an opportunity to tell his "side of the story."

[291 *N.J.Super.* at 113, 676 *A.*2d 1143.]

However, the proposed meeting on October 24, 1989, never occurred because it was canceled by Mehlman's counsel. Based on the final report prepared by Mobil's internal security staff, D'Ambrisi finally decided in late October 1989 to terminate Mehlman. He testified that he had no knowledge of Mehlman's remarks about benzene to MSKK managers when he decided to discharge Mehlman. At D'Ambrisi's direction, Silvestri informed Mehlman of his termination on November 2, and confirmed by letter of November 8, 1989, that Mobil was discharging Mehlman for cause.

At trial, Mehlman conceded that he had periodically used Mobil's resources to assist Princeton Scientific, his wife's publishing company, but asserted that he did so with the consent of John McCullough, Silvestri's predecessor, and because Princeton Scientific's publishing activities directly benefitted and enhanced Mobil's reputation in the relevant scientific community.

Although most of the trial testimony focused on Mobil's asserted justification for discharging Mehlman for cause, the jury rejected that testimony and apparently concluded that Mobil's alleged grounds for terminating Mehlman were pretextual. Accordingly, we need not describe in any further detail the trial evidence pertaining to Mobil's asserted reasons for firing Mehlman. A more complete discussion of that testimony is set forth in the Appellate Division's thoughtful and comprehensive opinion. 291 *N.J.Super.* at 111–17, 676 *A.*2d 1143.

B

The critical issue at trial was whether Mehlman satisfied his burden of proof on the question whether the sale in September

1989 by Mobil in Japan of gasoline with five percent or more benzene was "incompatible with a clear mandate of public policy concerning the public health, safety or welfare." *N.J.S.A.* 34:19–3c(3). In granting Mobil's motion for judgment notwithstanding the verdict, the trial court treated the existence of a clear mandate of public policy as a question of law and concluded that Mehlman had failed to prove that the sale of gasoline in Japan with five percent or more benzene in September 1989 was incompatible with a clear mandate of public policy. At trial, however, the existence of a clear mandate of public policy was presented to the jury as a fact issue. The trial court gave the jury a general instruction that attempted to define a clear mandate of public policy, described the usual sources of public policy, and briefly summarized the specific sources of public policy on which Mehlman relied. The jury, by an 8–0 vote, affirmatively answered the first jury interrogatory that posed this question: "Did Dr. Mehlman prove by a preponderance of the credible evidence that he objected to any activity, policy or practice that he reasonably believed was incompatible with a clear mandate of public policy concerning the public health, safety or welfare?"

Although it was undisputed at trial that no Japanese statute or governmental regulation in September 1989 expressly prohibited the sale of gasoline in Japan containing five percent or more benzene, the record contains substantial evidence that, combined with representations by counsel, persuasively suggested that gasoline with more than five percent benzene was hazardous to human health. For example, Mobil's counsel represented that gasoline sold currently in the United States must contain less than one percent benzene, and that gasoline sold in countries under the jurisdiction of the European Economic Community must contain less than five percent benzene. Moreover, since 1991 the Japanese government has prohibited the sale of gasoline containing more than five percent benzene.

At trial, Mehlman testified to his belief in September 1989 that benzene was carcinogenic, that excessive exposure to benzene

could cause leukemia in humans, and that "in Japan, with these high levels [of benzene], you would expect to get very high concentration," and to "expose thousands and thousands of people, and I expect many thousands to be injured at this level, unlike [the United States] where we have some type of [ ] control." Mehlman testified to the reliability of a scientific study admitted into evidence concerning the carcinogenicity of benzene, authored by A.J. McMichael, a noted epidemiologist, that stated:

> Chronic human exposure to benzene may result in adverse haematological effects, characterized by a variety of blood dyscrasias, including leucopenia, thrombocytopenia, pancytopenia and anaemia. Benzene is also considered to be a human carcinogen and is well established as a cause of leukaemia. It is recognized as being carcinogenic by the governments of Finland, the Federal Republic of Germany, Italy, Japan, Sweden, Switzerland and the U.S.A.
>
> [Footnote and citation omitted.]

Mehlman also testified to Mobil's awareness of the health hazards posed by gasoline with excessive benzene content, referring to a Mobil inter-office memorandum written in April 1977 to the President of Mobil Marketing and Refining. That memorandum described benzene as toxic and a possible carcinogen, and projected that the cost of reducing the benzene level in Mobil gasoline and other products could "run into the hundreds of millions of dollars." That memorandum noted that "[c]ontainers with 5% or more benzene are required to have a 'poison' label." Mehlman also testified to his familiarity with a 1981 Mobil management guide on product safety applicable to Mobil's United States and international affiliates that stated:

> [A]ll Mobil departments, divisions, and subsidiaries are responsible for the development, manufacture, and marketing of products in a manner consistent with applicable laws and the Corporation's high standards of safety, health, and environmental protection. In the absence of adequate local government requirements, Mobil affiliates will maintain standards of safety and health protection that consider scientific knowledge and established practices in developed countries.

Mehlman asserted that that memorandum required MSKK in September 1989 to follow Mobil's United States policy of limiting benzene levels of gasoline to less than five percent.

Mehlman also produced evidence of United States and Japanese regulations that, although not expressly prohibiting the sale of

gasoline with five percent or more benzene, were germane to the question whether such gasoline was hazardous to human health. A regulation of the Consumer Product Safety Commission (CPSC) effective March 4, 1988, 16 *C.F.R.* § 1500.14, provided in part as follows: "Because inhalation of the vapors of products containing 5 percent or more by weight of benzene may cause blood dyscrasias, such products shall be labeled with the signal word 'danger,' the statement of hazard 'Vapor harmful,' the word 'poison,' and the skull and crossbones symbol."

In addition, Mehlman offered evidence of a 1987 regulation adopted by the Occupational Safety and Health Administration (OSHA), 29 *C.F.R.* § 1910.1028, that lowered the permissible benzene exposure limit for workers from ten parts to one part per million averaged over an eight-hour workday. The regulation exempted the sale of gasoline subsequent to its discharge from bulk wholesale storage facilities, and also exempted loading and unloading operations at bulk wholesale storage facilities that use vapor control systems. Mehlman previously had testified that vapor control systems were not used in Japan in 1989. However, no evidence implied that either the CPSC or the OSHA regulation applied outside of the United States.

Mehlman testified that when he objected to the benzene content in MSKK's gasoline, he reasonably believed that the Japanese government would have adopted laws and regulations controlling the benzene content of commercial products. Citing examples such as the use of seatbelts and the removal of lead from gasoline, he stated that Japanese regulators usually were responsive to the acceptance of United States product safety standards. Mehlman also relied as a source of public policy on the United States–Japanese Friendship Treaty, which by its terms permitted

[n]ationals of either Party ... to enter on the territories of the other Party ... for the purpose of developing and directing the operations of an enterprise in which they have invested ... a substantial amount of capital ... subject to the right of either Party to apply measures that are necessary to maintain public order and protect the public health, morals and safety.

Mehlman asserted that Japanese regulations and guidelines controlling the use of benzene constituted "measures [ ] necessary to protect the public health within the meaning of the Friendship Treaty."

In that connection, Mehlman offered evidence of a 1974 Japanese environmental regulation requiring that public drinking water have a benzene content of no more than .01 milligrams per liter of water. Although a trial court evidentiary ruling limited Mehlman's explanation of the relevance of that regulation, the fair import of his testimony was that the high benzene levels in MSKK gasoline would adversely affect the benzene levels in Japanese public drinking water through vaporization, condensation and gasoline spills. In opposition to Mobil's pre-trial summary judgment motion, Mehlman also certified that "[b]enzene levels of 5% or greater in gasoline would have caused contamination of public water far in excess of 0.01 mg per liter." Mobil did not refute either Mehlman's testimony or his certification concerning the direct effect of high benzene levels in Japanese gasoline on the benzene levels in public drinking water.

In addition, Mehlman relied on evidence presented by John Drummond, a Mobil witness, that the Japanese Petroleum Association, of which MSKK was a member, had issued a guideline banning the sale in Japan of gasoline with more than five percent benzene. Drummond, a Mobil executive for twenty-three years with responsibilities in international marketing and manufacturing, described the Japanese Petroleum Association as an organization consisting of oil companies operating in Japan that represented the interests of the oil industry in its relationships with Japanese governmental authorities. He testified that in late 1987 or early 1988 the Japanese Petroleum Association adopted a guideline that limited the benzene content of Japanese gasoline to less than five percent.

Takashi Tsunemori, the manager of MSKK's technical service department, also testified as a Mobil witness and confirmed that he was familiar with the Japanese Petroleum Association guideline

limiting the benzene content of gasoline to less than five percent. On direct examination he was asked if he considered MSKK "bound by those guidelines" and whether he was "required to observe them." Tsunemori responded that his direct superior, Mr. Ozowa, was the person responsible for complying with the guidelines and that he, Tsunemori, as Ozowa's subordinate, was also responsible for compliance. On cross-examination, Tsunemori was questioned about the benzene content of Japanese gasoline shown on various refinery reports. Specifically, he was asked if a refinery report showing more than five percent benzene would constitute a violation of the agreement with the Japanese Petroleum Association. Tsunemori replied that "[t]he 5 percent maximum of benzene is based among our industry, so I don't know [if] the word violate is correct or not." When the trial court asked Mobil's trial counsel if he understood Tsunemori's answer, Mobil's counsel explained: "I think he said, your Honor, that the way the industry works, no member of the association would violate a voluntary guideline." [1]

Mehlman also testified to his belief that New Jersey product liability law constituted a clear mandate of public policy that barred the sale in Japan of gasoline with five percent or more benzene because that body of law imposed a duty on the seller of a hazardous product to warn consumers about the hazard. He also testified that principles of New Jersey negligence law could have exposed him to a claim of malpractice as a toxicologist if he had

---

[1] In that connection, we also note the following observation made by Mobil's trial counsel during argument of Mobil's summary judgment motion:

But the Japanese, as I understand it, prefer to operate by guidelines. They are perhaps a better behaved society than are we. [I] will tell you that a guideline in Japan would produce the same result as a rule or regulation in the United States, that once the guideline becomes five percent, then no marketer of gasoline in Japan would exceed it.

In its Appellate Division reply brief, Mobil contends that its counsel's reference to guidelines during argument of the summary judgment motion was limited to governmental guidelines.

failed to warn MSKK managers of the danger of selling gasoline containing five percent or more benzene.

Although the trial court excluded from evidence the Code of Ethics of the Society of Toxicology, to which Mehlman belonged, the court permitted Mehlman's counsel to argue in summation that that Code of Ethics constituted a mandate of public policy because it required Society members to "seek to communicate information concerning health, safety and toxicity in a timely and responsible manner, with due regard for the significance and credibility of the available data."

C

An economist testified about Mehlman's claim for damages. He calculated that the difference between Mehlman's actual earnings since his discharge and the income he would have earned at Mobil from November 1989 through 1993 was $524,974. He calculated Mehlman's prospective wage losses for the ensuing six years until his projected retirement at age sixty-five at $132,000 per year. The economist testified that the present value of Mehlman's lost pension benefits was $373,326. He also testified that, on the assumption Mehlman would have continued to receive options on 1750 shares of Mobil stock each for the ten years until his retirement, and estimating an annual increase in the value of the stock at a rate of eleven and one-half percent, the present value of Mehlman's lost stock-option benefit was $875,000.

The jury found that Mehlman had proved "that he objected to any activity, policy, or practice that he reasonably believed was incompatible with a clear mandate of public policy concerning the public health, safety or welfare," and that Mobil took retaliatory action against him because of his objections.

The jury awarded Mehlman $2,565,300 as compensation for his financial losses and $875,000 in emotional distress damages. After the parties stipulated that Mobil's net worth was approximately $11,986,000,000 and that its gross revenue for the past twelve

months was approximately $60,522,000,000, the jury awarded Mehlman punitive damages in the amount of $3,500,000.

The jury also rejected Mehlman's breach of contract claim, concluding that Mehlman had failed to prove that Mobil violated its policy that prohibited termination except for good cause.

## II

This appeal requires our further examination of the scope of New Jersey's Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8, described at the time of its enactment as the most far reaching "whistleblower statute" in the nation. John H. Dorsey, *Protecting Whistleblowers, N.Y. Times,* Nov. 2, 1986, § 11 (N.J.), at 34. In general terms we have stated that the purpose of CEPA is "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Abbamont v. Piscataway Bd. of Educ.,* 138 *N.J.* 405, 431, 650 *A.*2d 958 (1994); *accord Barratt v. Cushman & Wakefield,* 144 *N.J.* 120, 127, 675 *A.*2d 1094 (1996). The Appellate Division has observed that "CEPA is derived from the principle that 'an employer's right to discharge an employee carries a correlative duty to protect his freedom to decline to perform an act that would constitute a violation of a clear mandate of public policy.' " *Young v. Schering Corp.,* 275 *N.J.Super.* 221, 234, 645 *A.*2d 1238 (1994) (quoting *D'Agostino v. Johnson & Johnson, Inc.,* 225 *N.J.Super.* 250, 265, 542 *A.*2d 44 (App.Div.1988), *aff'd,* 115 *N.J.* 491, 559 *A.*2d 420 (1989)), *aff'd,* 141 *N.J.* 16, 660 *A.*2d 1153 (1995). Specifically, we consider whether the broad protections against employer retaliatory action that CEPA affords to New Jersey employees are available when the relevant mandate of public policy is intended to protect the health, safety or welfare of people who reside outside of New Jersey. We also consider the sources of clear mandates of public policy that will trigger a CEPA cause of action, and in that context we examine the extent to which generally accepted scienti-

fic principles can assist a court in determining whether a clear mandate of public policy has been established.

We previously have recognized that the statutory cause of action authorized by CEPA elaborates on and derives from the common law cause of action for wrongful discharge this Court first recognized in *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 72, 417 *A.*2d 505 (1980). *Barratt, supra,* 144 *N.J.* at 126–27, 675 *A.*2d 1094; *Young v. Schering Corp.*, 141 *N.J.* 16, 26–27, 660 *A.*2d 1153 (1995). Accordingly, the caselaw determining the sources and characteristics of clear mandates of public policy for the purpose of applying the *Pierce* doctrine is also useful in defining the parameters of a CEPA claim. In *Pierce, supra,* we rejected the wrongful discharge claim of a research physician who objected to her employer's further research concerning an anti-diarrhea drug containing saccharin. 84 *N.J.* at 76, 417 *A.*2d 505. That research might have led to the filing of an investigational-new-drug application with the Federal Food and Drug Administration. *Id.* at 74, 417 *A.*2d 505. Pierce informed her supervisor that her continued participation in the effort to develop the drug would violate her understanding of the Hippocratic oath because of her view that the saccharin in the drug could be harmful during testing on children and elderly persons, although she acknowledged that the issue was medically debatable. When her employer transferred her to another project, Pierce considered the transfer to be a demotion and resigned. She filed suit alleging that she effectively had been discharged for refusing to participate in research that was contrary to her interpretation of the Hippocratic oath. *Id.* at 62–64, 417 *A.*2d 505. Reversing the Appellate Division, we reinstated the trial court's grant of summary judgment to the employer, reasoning that "there is no public policy against conducting research on drugs that may be controversial, but potentially beneficial to mankind, particularly where continuation of the research is subject to approval by the FDA," and concluding that "the Hippocratic oath does not contain a clear mandate of public policy that prevented Dr. Pierce from continuing her research on [the drug]." *Id.* at 76, 417 *A.*2d 505. Nevertheless, the Court

imposed a new limitation on an employer's power to fire an at-will employee:

> We hold that an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy. The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy.... Absent legislation, the judiciary must define the cause of action in case-by-case determinations. An employer's right to discharge an employee at will carries a correlative duty not to discharge an employee who declines to perform an act that would require a violation of a clear mandate of public policy. However, unless an employee at will identifies a specific expression of public policy,.he may be discharged with or without cause.
>
> [*Id.* at 72, 417 A.2d 505.]

We take note of some of the post-*Pierce* decisions that appear to have elaborated on one or more elements of the *Pierce* cause of action. For example, in *MacDougall v. Weichert,* 144 *N.J.* 380, 391–92, 677 A.2d 162 (1996), we observed:

> A basic requirement of the wrongful discharge cause of action is that the mandate of public policy be clearly identified and firmly grounded.
>
> A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate. Its alleged violation will not sustain a wrongful discharge cause of action.
>
> (Citations omitted.)

In *Zamboni v. Stamler,* 847 *F.*2d 73, 83, *cert. denied,* 488 *U.S.* 899, 109 *S.Ct.* 245, 102 *L.Ed.*2d 233 (1988), the Third Circuit Court of Appeals, noting that the *Pierce* cause of action literally applied only to wrongful discharge claims, predicted that this Court would extend *Pierce* to apply to any retaliatory employer action affecting compensation or job rank, and also identified clauses of the United States and New Jersey Constitutions as sources of public policy underlying the plaintiff's *Pierce* claim. *See also Radwan v. Beecham Lab.,* 850 *F.*2d 147, 151–52 (3d Cir.1988) (recognizing Art. 1, para. 19 of New Jersey Constitution as source of clear mandate of public policy); *Hennessey v. Coastal Eagle Point Oil Co.,* 129 *N.J.* 81, 93, 609 A.2d 11 (1992) (acknowledging that language of and jurisprudence interpreting New Jersey Constitution can constitute clear mandate of public policy). We also note, without expressing any view on its soundness, the Appellate Division's conclusion in *House v. Carter–Wallace, Inc.,* 232 *N.J.Super.* 42, 51, 556 A.2d 353, *certif. denied,* 117 *N.J.* 154, 564 A.2d 874 (1989), that an

employee who was discharged for objecting to other company executives about the distribution of possibly contaminated tooth polish could not maintain a *Pierce* cause of action because he failed to notify any governmental agency of the potential hazard to public health.

A number of cases have recognized a *Pierce* cause of action based on an employee discharge found to violate a clear mandate of public policy. See, *e.g., Radwan, supra,* 850 *F.*2d at 151–52 (holding that plaintiff's allegation that his discharge was in retaliation for refusing to "set up" shop steward by planting illegal object on him asserts *Pierce* cause of action, and finding clear mandate of public policy in provisions of National Labor Relations Act and New Jersey Constitution protecting right to organize and bargain collectively); *Velantzas v. Colgate–Palmolive Co.,* 109 *N.J.* 189, 192–93 & n. 1, 536 *A.*2d 237 (1988) (*per curiam*) (reversing summary judgment, holding that allegation of retaliatory discharge of employee who sought access to personnel records in order to establish basis for gender discrimination claim adequately stated cause of action under *Pierce,* and finding clear mandate of public policy in federal cases treating pursuit of employment discrimination claim as protected activity under federal law); *Lally v. Copygraphics,* 85 *N.J.* 668, 670, 428 *A.*2d 1317 (1981) (holding Workers' Compensation Act to constitute clear mandate of public policy on which to base *Pierce* claim by employee discharged in retaliation for filing Workers' Compensation claim); *Potter v. Village Bank,* 225 *N.J.Super.* 547, 558–61, 543 *A.*2d 80 (App.Div.) (holding that discharge of bank president who reported suspected laundering of Panamanian drug money through series of cash deposits slightly below $10,000 supported retaliatory discharge claim under *Pierce,* and finding clear mandate of public policy in federal statute and regulations requiring banks to report certain cash transactions), *certif. denied,* 113 *N.J.* 352, 550 *A.*2d 462 (1988); *Cerracchio v. Alden Leeds, Inc.,* 223 *N.J.Super.* 435, 445, 538 *A.*2d 1292 (App.Div.1988) (holding that state statute requiring employers to provide safe and healthful place of employment constitutes clear mandate of public policy supporting *Pierce*

wrongful-discharge claim by employee who allegedly was fired for reporting chlorine gas exposure at work to OSHA); *Kalman v. Grand Union Co.*, 183 *N.J.Super.* 153, 157–59, 443 *A.*2d 728 (App.Div.1982) (reversing summary judgment, and finding plaintiff's allegation of retaliatory discharge for refusing to close pharmacy on July 4 and for reporting proposed closing to Board of Pharmacy sufficient to assert *Pierce* cause of action, and holding that state statute, regulations, and American Pharmaceutical Association Code of Ethics constituted clear mandates of public policy); *cf.* *O'Sullivan v. Mallon*, 160 *N.J.Super.* 416, 418–19, 390 *A.*2d 149 (Law Div.1978) (holding, pre-*Pierce*, that complaint alleging that plaintiff x-ray technician was discharged for refusing to perform catheterizations, which she could not legally perform, stated a cause of action).

A number of other courts have declined to find that an employee's discharge violated a clear mandate of public policy. See, *e.g.*, *Chelly v. Knoll Pharmaceuticals*, 295 *N.J.Super.* 478, 490–91, 685 *A.*2d 498 (App.Div.1996) (finding plaintiff's discharge not in violation of clear mandate of public policy where firing was in retaliation for plaintiff's objection to employer's failure immediately to report to Food and Drug Administration non-serious elevations of liver enzyme in tests on experimental drug and employer agreed that such report eventually would be filed); *DeVries v. McNeil Consumer Prods. Co.*, 250 *N.J.Super.* 159, 172, 593 *A.*2d 819 (App.Div.1991) (holding that discharge of pharmaceutical company employee for having distributed at employer's direction "expired" Tylenol caplets to physicians' offices for staff use, although possibly unfair, did not violate clear mandate of public policy because discharge "implicated only the private interests of the parties"); *Schwartz v. Leasametric, Inc.*, 224 *N.J.Super.* 21, 30, 539 *A.*2d 744 (App.Div.1988) (holding that discharge of employee to avoid paying commissions that he had earned did not violate clear mandate of public policy); *Giudice v. Drew Chemical Corp.*, 210 *N.J.Super.* 32, 36, 509 *A.*2d 200 (App.Div.) (holding that discharge of employees who privately investigated allegedly wrongful conduct of company president and refused to "conceal and cover up" such con-

duct did not violate clear mandate of public policy, but noting that different result would· be reached if investigation had occurred in cooperation with law enforcement officials), *certif. denied,* 104 *N.J.* 465, 517 *A.*2d 449 (1986); *Alexander v. Kay Finlay Jewelers, Inc.,* 208 *N.J.Super.* 503, 507–08, 506 *A.*2d 379 (App.Div.) (holding that discharge of employee in retaliation for filing suit to resolve salary dispute did not violate clear mandate of public policy), *certif. denied,* 104 *N.J.* 466, 517 *A.*2d 449 (1986); *Warthen v. Toms River Community Mem'l Hosp.,* 199 *N.J.Super.* 18, 28, 488 *A.*2d 229 (App.Div.) (holding that discharge of nurse for refusing to administer kidney dialysis to terminally ill patient did not violate clear mandate of public policy because nurse acted on basis of her own "moral, medical and philosophical objections"), *certif. denied,* 101 *N.J.* 255, 501 *A.*2d 926 (1985).

The relatively few cases construing the "clear mandate of public policy" language in CEPA, *N.J.S.A.* 34:19–3c(3), have analyzed that term in a manner that is generally consistent with its application for purposes of the *Pierce* doctrine. Thus, in *Abbamont, supra,* a non-tenured industrial arts teacher alleged that the local board of education that employed him, through its supervisory employees, retaliated against him by denying him tenure and by not rehiring him because he complained about unsatisfactory health and safety conditions in the school's metal shop. 138 *N.J.* at 410, 650 *A.*2d 958. The evidence established that at an early stage of plaintiff's employment the school district's Industrial Arts Supervisor distributed to the teaching staff the "New Jersey Industrial Arts Education Safety Guide" and supporting documents, and informed the staff that the Guide and related material constituted the school board's "official safety guide." *Id.* at 424, 650 *A.*2d 958. That Guide and its enclosures required "dependable ventilation" providing "a minimum amount of outdoor air supply and exhaust on movement" for various forms of industrial arts, including metal workshops. *Ibid.* We determined that the Guide and its accompanying materials "directly and specifically addressed matters of health and safety and fully reflected a

mandate of public policy relating to general concerns of health, safety and environmental protection." *Ibid.*

Although no evidence in the record demonstrated plaintiff's specific familiarity with the regulations requiring adequate metal shop ventilation, we concluded that the record established that plaintiff, as required by CEPA, had objected to a practice that he "reasonably believe[d] . . . is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment" (*N.J.S.A.* 34:19-3(c)(3)):

> Plaintiff also demonstrated "a reasonable, objective belief that the conduct of the school officials was a specific violation" of those regulatory standards and "incompatible" with their public policy mandate. Plaintiff's own description of the lack of ventilation and the poor air quality in the shop and its corroboration by Schweitzer's testimony as well as plaintiff's work-related pulmonary problems underscore the reasonableness of that belief. The objectivity, as well as reasonableness, of that belief was further evidenced by the opinion of plaintiff's expert on ventilation, Mark Goldberg, an industrial hygienist, who testified that operating the machines in plaintiff's shop without individual ventilation hoods was unsafe, given the emissions of fumes and gases created by the melting of plastics and welding of metals as well as the dust created by the grinding of metals.
>
> [*Abbamont, supra,* 138 *N.J.* at 424–25, 650 *A.*2d 958.]

*See also Sandom v. Travelers Mortgage Servs., Inc.,* 752 *F.Supp.* 1240, 1243–46 (D.N.J.1990) (holding that plaintiff's allegation that employer terminated her employment in retaliation for her filing discrimination claim with federal Equal Employment Opportunity Commission adequately set forth cause of action under CEPA); *LePore v. National Tool & Mfg. Co.,* 115 *N.J.* 226, 227–28, 557 *A.*2d 1371 (affirming Appellate Division holding that *Pierce* doctrine applies to retaliatory discharge claim by employee covered by collective bargaining agreement who is fired for reporting workplace safety violations, and agreeing with Appellate Division's observation that subsequently enacted CEPA statute would also have provided grounds for retaliatory discharge suit if events had occurred after its enactment), *cert. denied,* 493 *U.S.* 954, 110 *S.Ct.* 366, 107 *L. Ed.*2d 353 (1989); *Parker v. M & T Chem., Inc.,* 236 *N.J.Super.* 451, 460–63, 566 *A.*2d 215 (App.Div.1989) (holding plaintiff's complaint alleging CEPA violation sufficient to withstand motion to dismiss for failure to state claim, where in-house

counsel asserted that employer discharged him for objecting to employer's use of competitor's confidential trade secrets obtained improperly from pending federal court proceeding by competitor's employee); *cf. Littman v. Firestone Tire & Rubber Co.,* 715 *F.Supp.* 90, 93–94 (S.D.N.Y.1989) (dismissing on summary judgment plaintiff's allegations of CEPA violation and holding that conduct to which plaintiff objected, consisting of company employee's overpayment for parcel of property plaintiff had negotiated to acquire for employer at lower price, did not violate clear mandate of public policy because thrust of CEPA is to protect those who expose activity harmful to public and activity objected to by plaintiff concerned alleged fraud to harm only employer with limited indirect effect on public represented by company's shareholders); *Fineman v. New Jersey Dep't of Human Servs.,* 272 *N.J.Super.* 606, 620–29, 640 *A.*2d 1161 (App.Div.) (reversing judgment after jury trial on CEPA claim in favor of plaintiff and holding that although plaintiff was only physician available to treat approximately 300 patients at long-term care facility for disabled and elderly veterans, no clear mandate of public policy justified plaintiff's refusal to treat facility patients needing immediate medical care and evidence at trial demonstrated that plaintiff's discharge was prompted by refusal to treat patients and not by objection to inadequate staffing; noting that existence of clear mandate of public policy is question of law to be determined by court), *certif. denied,* 138 *N.J.* 267, 649 *A.*2d 1287 (1994); *Haworth v. Deborah Heart & Lung Ctr.,* 271 *N.J.Super.* 502, 505–506, 638 *A.*2d 1354 (App.Div.1994) (affirming dismissal of CEPA claim on summary judgment, holding that hospital's dismissal of blood-bank supervisor who destroyed blood samples allegedly in protest against hospital's inadequate blood identification practices not actionable under CEPA, and concluding that plaintiff's discharge was provoked by his destructive act and not by objection to practice violating clear mandate of public policy); *Catalane v. Gilian Instrument Corp.,* 271 *N.J.Super.* 476, 493–94, 638 A.2d 1341 (App.Div.) (holding that vague allegation that plaintiff's discharge was in retaliation for his objection to termination of

another employee and his statements about taking up with federal authorities employer's violation of "certain labor laws" insufficient to state claim under CEPA that discharge was in retaliation for objecting to practice constituting violation of clear mandate of public policy), *certif. denied,* 136 *N.J.* 298, 642 *A.*2d 1006 (1994).

We recognized as far back as *Pierce, supra,* that because the sources and parameters of public policy are not susceptible to hard and fast rules, "the judiciary must define the cause of action in case-by-case determinations." 84 *N.J.* at 72, 417 *A.*2d 505. That recognition applies not only to the common-law retaliatory discharge claim but to the more expansive CEPA claim as well. Although outright violations of criminal and civil statutes invariably will constitute practices incompatible with clear mandates of public policy, that the outer limits of that phrase defies precise description has long been understood:

> Public policy has been defined as that principal of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the public good. The term admits of no exact definition.... Public policy is not concerned with minutiae, but with principles.
>
> [*Schaffer v. Federal Trust Co.,* 132 *N.J. Eq.* 235, 240–41, 28 *A.*2d 75 (Ch.1942) (citations omitted).]

Accordingly, for purposes of both *Pierce* and CEPA claims, the determination whether the plaintiff adequately has established the existence of a clear mandate of public policy is an issue of law. Its resolution often will implicate a value judgment that must be made by the court, and not by the jury. *See Fineman, supra,* 272 *N.J.Super.* at 619–20, 640 *A.*2d 1161; *Warthen, supra,* 199 *N.J.Super.* at 24–25, 488 *A.*2d 229. Although that precise question was contested in the Law Division, and that court initially allowed the jury to decide if plaintiff had proved the existence of a clear mandate of public policy, the parties now agree that determination of the existence of a clear mandate of public policy must be made by the court.

The specific applications of the CEPA cause of action continue to evolve. But the core value that infuses CEPA is the legislative determination to protect from retaliatory discharge

those employees who, "believing that the public interest overrides the interest of the organization [they] serve[ ], publicly 'blow[ ] the whistle' [because] the organization is involved in corrupt, illegal, fraudulent or harmful activity." Ralph Nader et al., *Whistleblowing: The Report of the Conference on Professional Responsibility* (1972). We look generally to the federal and state constitutions, statutes, administrative rules and decisions, judicial decisions, and professional codes of ethics to inform our determination whether specific corrupt, illegal, fraudulent or harmful activity violates a clear mandate of public policy, but those sources are not necessarily exclusive. A salutary limiting principle is that the offensive activity must pose a threat of public harm, not merely private harm or harm only to the aggrieved employee. See *Littman, supra,* 715 *F.Supp.* at 93; *Schwartz, supra,* 224 *N.J.Super.* at 30, 539 *A.2d* 744; *Alexander, supra,* 208 *N.J.Super.* at 508, 506 *A.2d* 379.

Defendant Mobil urges that we impose another limitation in cases where the employer's offensive conduct occurs out-of-state, even though the discharge occurs in New Jersey: that no CEPA claim can be sustained unless a clear mandate of New Jersey public policy, having extraterritorial application, is violated and that violation adversely affects the health and welfare of New Jersey residents. Mobil infers that that limitation is required by our decision in *D'Agostino v. Johnson & Johnson, Inc., supra,* 133 *N.J.* 516, 628 *A.2d* 305, in which the question was whether Swiss or New Jersey law governed a *Pierce* claim by a United States citizen residing in Switzerland against a New Jersey corporation for allegedly ordering its Swiss subsidiary to fire plaintiff in Switzerland. The plaintiff allegedly refused to pay a bribe to a Swiss regulatory official involved in the review of a drug that the Swiss subsidiary was attempting to register in Switzerland. *Id.* at 518–19, 628 *A.2d* 305.

In *D'Agostino,* this Court applied the governmental interest test to resolve the choice of law issue, noting that "[t]he determinative law is 'that of the state with the greatest interest in governing the

*particular issue'* and that the *'qualitative,* not the *quantitative,* nature of a state's contacts ultimately determines whether its law should apply.' " *Id.* at 526, 628 *A.*2d 305 (quoting *Veazey v. Doremus,* 103 *N.J.* 244, 248, 510 *A.*2d 1187 (1986)). We determined that the federal Foreign Corrupt Practices Act, 15 *U.S.C.* §§ 78dd–1 to –2 (FCPA), which prohibits gifts to foreign officials to influence decisions of foreign governments, constituted a clear mandate of New Jersey public policy that applied extraterritorially to the actions of subsidiaries of a New Jersey corporation. *D'Agostino, supra,* 133 *N.J.* at 531, 628 *A.*2d 305. In balancing the respective interests, we specifically recognized that the alleged commercial bribery of the Swiss regulatory official potentially could have affected the registration of the drug with the United States Food and Drug Administration, thereby posing a threat to the health and safety of New Jersey citizens. *Id.* at 532–33, 628 *A.*2d 305. We also took cognizance of Switzerland's interest in applying its law to an employment dispute between a Swiss resident and a Swiss company. *Id.* at 535, 628 *A.*2d 305. We noted that plaintiff initially was hired by an employment agency chosen by Johnson & Johnson, Inc. (J & J), that his hiring and termination announcements were released by J & J's international subsidiary in New Jersey, and that his discharge occurred shortly after a meeting at J & J's New Jersey corporate headquarters. *Id.* at 536, 628 *A.*2d 305. We observed that J & J arguably had extensive involvement in plaintiff's discharge, and allegedly had ordered in New Jersey that plaintiff bribe a Swiss official in violation of the FCPA. *Id.* at 537, 628 *A.*2d 305. Accordingly, we concluded that New Jersey rather than Swiss law should apply. *Id.* at 536–37, 628 *A.*2d 305.

As did the Appellate Division, 291 *N.J.Super.* at 128–30, 676 *A.*2d 1143, we note that the significant distinction between *D'Agostino* and this case is that Mehlman was discharged in New Jersey by a New Jersey employer, thereby presenting no question of the extension of CEPA to a foreign employment relationship similar to that involved in *D'Agostino.* Moreover, our emphasis in *D'Agostino* on the potential threat to the health of New Jersey residents

was germane to the existence of a clear mandate of public policy as well as to the choice of law issue, and was not intended to constitute a mandatory element of a *Pierce* cause of action. 133 *N.J.* at 532–35, 628 *A*.2d 305.

### III

In addressing whether the evidence adduced at trial was sufficient to sustain plaintiff's burden of proving the existence of a clear mandate of public policy, we note preliminarily that Mobil offered no evidence contradictory to plaintiff's proofs that gasoline containing more than five percent benzene posed a significant health hazard. Rather, Mobil's witnesses attempted to demonstrate that gasoline sold by its Japanese subsidiary did not contain more than five percent benzene, and acknowledged that the sale of gasoline with more than five percent benzene would be impermissible because of a guideline of the Japanese Petroleum Association, to which it adhered, limiting the benzene content of Japanese gasoline to less than five percent.

The trial record contained abundant evidence concerning the health hazard to humans of products containing excess quantities of benzene, and persuasive evidence that benzene constituting more than five percent of gasoline was an excessive and hazardous quantity. Mehlman, Mobil's chief toxicologist and indisputably an expert on the subject of health hazards posed by the composition of gasoline, testified that high concentrations of benzene can cause leukemia and that if MSKK were selling gasoline with more than five percent benzene he would "expect many thousands to be injured at this level." A scientific study by a noted epidemiologist confirmed that benzene is a human carcinogen. A 1977 Mobil internal memorandum described benzene as toxic and a possible carcinogen, projecting that the cost of reducing the benzene content of Mobil products could "run into the hundreds of millions of dollars."

Evidence of United States governmental efforts to regulate commercial uses of benzene also confirmed its hazardous qualities

and verified that concentrations of five percent or more were significant. A 1988 Consumer Product Safety Commission regulation required products with five percent or more benzene to be labeled as poisonous. In addition, a 1987 OSHA regulation, although exempting the sale of gasoline after removal from bulk wholesale storage facilities, reduced permissible benzene exposure limits for workers to one part per million averaged over an eight-hour workday.

Evidence of governmental regulation subsequent to the critical events of September 1989 also corroborated Mehlman's testimony that the sale of gasoline with more than five percent benzene was hazardous to human health. According to testimony from a Mobil witness and representations from Mobil's counsel, in Japan, since 1991, and currently in countries under the European Economic Community's jurisdiction, the sale of gasoline with five percent or more benzene is prohibited, and currently in the United States the sale of gasoline with more than *one* percent benzene is prohibited.

In addition to the generalized evidence about the danger of benzene and the specific health hazard of gasoline containing five percent or more benzene, plaintiff offered proof of a 1974 Japanese regulation limiting the benzene content of Japanese public drinking water to no more than .01 milligrams per liter, and also provided uncontradicted testimony, although limited by the trial court, that the sale of gasoline with more than five percent benzene would adversely affect the permitted benzene level in Japanese drinking water.

Moreover, as previously noted, a Mobil witness testified that in late 1987 or early 1988 the Japanese Petroleum Association, of which Mobil's Japanese subsidiary MSKK was a member, adopted a guideline limiting the benzene content of Japanese gasoline to less than five percent. The manager of MSKK's technical service department confirmed that MSKK was required to comply with that guideline. When asked about violations of the guideline his response, as explained by Mobil's counsel, was that "the way the

industry works, no member of the association would violate a voluntary guideline."

█ In view of the evidence that the Japanese Petroleum Association represented the oil industry's interests in its relationship with the Japanese government and that its members considered themselves obligated to comply with the Association's guideline, we are convinced that the Japanese Petroleum Association Guideline prohibiting the sale of gasoline with five percent or more benzene constituted a clear mandate of public policy. We reach that conclusion not merely because "Mobil agreed to be bound by the Association's policies," as our dissenting colleagues infer. *Post* at 200–01, 707 *A*.2d at 1019. This specific guideline, which confirmed a broad scientific consensus undisputed by the record that gasoline with more than five percent benzene was hazardous to human health, reflected a commitment by the Japanese oil industry not to market a gasoline product acknowledged to be unsafe. As the trial testimony demonstrates, the practical effect of the guideline was essentially equivalent to the effect of governmental regulatory action. Considering the totality of the proofs, including the Japanese environmental regulation concerning the maximum benzene content of public drinking water, and the persuasive scientific and regulatory evidence demonstrating that gasoline with five percent or more benzene is hazardous to human health, we entertain no doubt that plaintiff satisfied his burden of proving that the sale in Japan in September 1989 of gasoline with five percent or more benzene was incompatible with a clear mandate of public policy for purposes of CEPA liability.

Mobil contends that even if in September 1989 the sale of gasoline with five percent or more benzene was incompatible with a clear mandate of public policy, CEPA requires that the objecting employee have in mind the existence of the specific mandate of public policy at the time he takes issue with the questioned activity or practice. In pertinent part CEPA provides:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:

....

c.  Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

....

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[*N.J.S.A* 34:19–3.]

We decline to read CEPA so narrowly. As noted, caselaw has identified relatively unfamiliar sources, including clauses of the federal and state constitutions, as sources of public policy, see *Radwan, supra,* 850 *F.*2d at 151–52; *Zamboni, supra,* 847 *F.*2d at 83; *Hennessey, supra,* 129 *N.J.* at 93, 609 *A.*2d 11, for purposes of *Pierce* or CEPA claims. Whistleblower claims based on constitutional provisions, or on relatively unknown statutory or regulatory enactments, would be restricted unreasonably if their success were conditioned on the plaintiff's proof that he or she was aware specifically of the relevant source of public policy at the time of objection to the employer's practice. In *Abbamont, supra,* 138 *N.J.* at 424, 650 *A.*2d 958, we imposed no requirement of proof by the plaintiff that when he objected to inadequate ventilation in the school's metal shop he was specifically familiar with the New Jersey Industrial Arts Education Safety Guide that mandated dependable ventilation.

■  In our view, the sensible meaning of CEPA is that the objecting employee must have an objectively reasonable belief, at the time of objection or refusal to participate in the employer's offensive activity, that such activity is either illegal, fraudulent or harmful to the public health, safety or welfare, and that there is a substantial likelihood that the questioned activity is incompatible with a constitutional, statutory or regulatory provision, code of ethics, or other recognized source of public policy. Specific knowledge of the precise source of public policy is not required. The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe

to be unlawful or indisputably dangerous to the public health, safety or welfare.

Mobil also argues that reversal is required because the trial court did not decide whether plaintiff had proved the existence of a clear mandate of public policy, and directed the jury to determine whether the sale of gasoline in Japan containing five percent or more benzene was incompatible with a clear mandate of public policy. So instructed, the jury's focus during deliberations would have been on whether plaintiff entertained an objectively reasonable belief, when he objected to MSKK's sale of gasoline with excessive benzene, that the practice was incompatible with a clear mandate of public policy concerning the public health, safety or welfare.

■ Nevertheless, we find that in the context of this record the trial court's error was harmless. See *Nicosia v. Wakefern Food Corp.*, 136 *N.J.* 401, 412, 643 *A.*2d 554 (1994) (applying harmless error standard in affirming civil jury verdict despite trial court's erroneous jury instructions). In effect, by its answer to the first jury interrogatory, the jury found as a fact the existence of a clear mandate of public policy even though the trial court failed to instruct the jury that it was required to do so as a matter of law. The lack of that instruction being more prejudicial to plaintiff rather than defendants, we are unable to conclude that the omission of the proper instruction was "clearly capable of producing an unjust result." *R.* 2:10–2. The ultimate question is whether, taking the charge as a whole and reading it in context, the jury was misled or inadequately informed. *Navarro v. George Koch & Sons, Inc.*, 211 *N.J.Super.* 558, 570–71, 512 *A.*2d 507 (App.Div.), *certif. denied*, 107 *N.J.* 48, 526 *A.*2d 138 (1986). We have no doubt that, properly instructed that plaintiff had proved the existence of a clear mandate of public policy, the jury would have reached exactly the same result in view of the overwhelming evidence that plaintiff's belief in the existence of a clear mandate of public policy was objectively reasonable.

Defendant also asserts that no valid CEPA claim can be maintained based on an employer's out-of-state conduct unless the clear public policy mandate violated is a New Jersey policy intended to have extraterritorial effect, and the out-of-state conduct adversely effects the health, welfare or safety of New Jersey citizens. As we previously observed, *supra*, at 190–91, 707 *A*.2d at 1014, that contention reflects an apparent misperception of our opinion in *D'Agostino, supra*, which involved a discharge in Switzerland of a Swiss employee by a Swiss company, and in which we emphasized the potential harm to New Jersey citizens to support our conclusions that a clear mandate of public policy was implicated and that New Jersey rather than Swiss law should apply. 133 *N.J.* at 532–35, 628 *A*.2d 305. Unlike *D'Agostino*, Mobil, a New Jersey employer, discharged plaintiff, a New Jersey employee, in New Jersey, and the application of New Jersey law is not in dispute, as it was in *D'Agostino*.

No prior *Pierce* or CEPA decision, however, has expressly recognized that a cause of action can be maintained based on a discharge in New Jersey in retaliation for an employee's objection to a practice that violated another jurisdiction's public policy and endangered that jurisdiction's citizens. At the pre-trial argument of Mobil's summary judgment motion, Mobil's trial counsel acknowledged that a Japanese "law, rule or regulation" prohibiting the sale in Japan of gasoline with more than five percent benzene could provide a basis for a CEPA violation. Although not binding on Mobil, that concession supports the logic of interpreting CEPA to apply even if the employer's action retaliates against an employee's protest of a violation of an out-of-state public policy. The core value embodied in CEPA is that employees courageous enough to object to illegal, fraudulent or harmful activity by their employers in order to protect the public welfare deserve to be shielded from retaliation by their employers. We would not impute to the Legislature so parochial an objective as to protect New Jersey employees retaliated against for taking risks to

protect only New Jersey citizens. In our view, the purposes of CEPA are no less served by recognizing a cause of action for a New Jersey employee whose employer retaliated against him or her for objecting to the violation of a clear mandate of public policy that threatened to harm citizens of other states or countries. Under CEPA, the wrongful conduct is the employer's retaliatory action, and we decline to impose artificial geographical limits on the harm or illegality that the objecting employee sought to avoid.

In its appeal as of right, *Rule* 2:2–1(a), Mobil contends that the Appellate Division's disposition constitutes an improper regulation of foreign commerce in violation of the Commerce Clause, *U.S. Const.*, art. 1, § 8, cl. 3, and also interferes with federal supremacy over foreign relations. As did the Appellate Division, we reject both contentions essentially for the reasons stated in the Appellate Division's opinion. 192 *N.J.Super.* at 130–35, 469 *A.*2d 41.

Mobil also asserts that the Appellate Division's disposition renders CEPA vague and overbroad. We find that contention to be wholly without merit. We also note the United States Supreme Court's observation that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 *U.S.* 489, 498, 102 *S.Ct.* 1186, 1193, 71 *L.Ed.*2d. 362, 371–72 (1982).

Finally, Mobil asserts that the Appellate Division's reinstatement of Mehlman's defamation claim is inconsistent with the objective of CEPA's waiver provision. *N.J.S.A.* 34:19–8. Relying on this Court's opinion in *Young v. Schering Corp., supra,* 141 *N.J.* at 31–32, 660 *A.*2d 1153, the Appellate Division concluded that CEPA's waiver provision is inapplicable but noted that Mehlman must prove different and distinct damages to avoid a double recovery in the event he pursues the defamation claim. 291 *N.J.Super.* at 143, 676 *A.*2d 1143. We are in full accord with the

Appellate Division's resolution of the defamation issue. *Id.* at 141–43, 676 *A.*2d 1143.

## IV

We affirm the judgment of the Appellate Division.

O'HERN, J., dissenting.

This appeal should result in a new trial. Simply put, the trial court improperly charged this jury, which returned a multi-million dollar verdict, concerning an essential element of a CEPA claim. (CEPA is the acronym for the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8, often referred to as the Whistle Blower Law.)

## I

In New Jersey, an employer may terminate an employee for no reason, no good reason, or even for a morally wrong reason, unless the employee has an employment contract providing for termination only for cause or if the discharge is contrary to a clear mandate of public policy. *Woolley v. Hoffmann–La Roche, Inc.,* 99 *N.J.* 284, 290–91, 491 *A.*2d 1257 (discussing *Pierce v. Ortho Pharm. Corp.,* 84 *N.J.* 58, 72, 417 *A.*2d 505 (1980)), *modified,* 101 *N.J.* 10, 499 *A.*2d 515 (1985). According to CEPA, an employer may not terminate an employee for complaining about activities of the employer that offend a clear mandate of public policy. *N.J.S.A.* 34:19–3c(3). The majority correctly recognizes that the identification of a clear mandate of public policy that invokes protection under CEPA is strictly a judicial function. *Ante* at 187–88, 707 *A.*2d at 1012–13.

I can agree that an employee need not be certain that the employer's conduct is, in fact, illegal or in contravention of a clear mandate of public policy. *See Abbamont v. Piscataway Tp. Bd. of Educ.,* 138 *N.J.* 405, 650 *A.*2d 958 (1994) (holding that teacher need not know exact content of regulation governing ventilation in

metal shop in order to state claim). The employee must only have a reasonable belief that there is such a policy and that the employer's conduct violated the policy. Before a cause of action is stated, however, the court must find that such a policy actually exists.

Plaintiff identified a number of policies that he believed established the clear mandate of public policy. Among them were (1) Article I(3) of the *Treaty of Friendship, Commerce and Navigation between the United States and Japan;* (2) an agreement of the Japanese Petroleum Association banning the sale of gasoline with five percent or greater benzene levels; (3) a requirement of the Japanese Environmental Agency requiring that drinking water in Japan have no more than .01 mg/liter of benzene; (4) a regulation of the United States Consumer Product Safety Commission requiring products with five percent or more benzene to be labelled "poison" (defendant has pointed out that this regulation excluded gasoline from its coverage); (5) a Mobil memorandum concerning a regulation of the United States Occupational Safety and Health Administration concerning maximum exposure levels to benzene in the workplace; (6) a provision of the Ethical Code of the American Society of Toxicology concerning the communication of information concerning "health safety and toxicity"; (7) a scientific paper concerning the carcinogenicity of benzene; (8) the "Mobil Oil Corporation's Policy on Product Safety Stewardship"; and (9) an interoffice memorandum of Mobil stating that benzene had been considered toxic for years, particularly among rubber workers.

The trial court did not identify for the jury any of these as establishing a clear mandate of public policy. In effect, the court provided the jury with a laundry list of possible sources of public policy and permitted the jury to pick one for itself. (Paradoxically, the trial court that heard all of the evidence found that none established a clear mandate of public policy applicable to Mobil's conduct in Japan.) It is therefore simply impossible to have any

confidence that an unguided jury has correctly performed the function assigned to it.

## II

On a deeper level, the Court has mixed the issue of whether an employee reasonably believed that the employer's conduct contravenes a clear mandate of public policy with the question of whether there was *in fact* a clear mandate of public policy that made the conduct complained of illegal or unethical at the time of the employee's complaint.

## A.

When the Legislature adopted CEPA in 1986, it essentially "codified this Court's ruling in *Pierce* [ ], which protected employees against discharges that violated a clear mandate of public policy. The purpose of CEPA is to protect employees who report illegal or unethical work-place activities." *Barratt v. Cushman & Wakefield,* 144 *N.J.* 120, 126–27, 675 *A.2d* 1094 (1996) (discussing *Pierce, supra,* 84 *N.J.* at 72, 417 *A.2d* 505). The Court recognized that CEPA balances the right of a business person to run a business with the right of an employee to speak on important policy issues without fear of reprisal. The Court identified several sources of public policy.

> Out of respect for the employer's interest, employees can bring wrongful discharge claims only if they can identify an expression that equates with a clear mandate of public policy and if they can show that they were discharged in violation of that public policy. Sources of public policy include the United States and New Jersey Constitutions; federal and state laws and administrative rules, regulations, and decisions; the common law and specific judicial decisions; and in certain cases, professional codes of ethics:
>
> [*MacDougall v. Weichert,* 144 *N.J.* 380, 391, 677 *A.2d* 162 (1996).]

The linchpin "of the wrongful discharge cause of action is that the mandate of public policy be clearly identified and firmly grounded." *Ibid.* "A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate.

Its alleged violation will not sustain a wrongful discharge cause of action." *Id.* at 392, 677 *A.*2d 162.

## B.

What was the illegal conduct complained of by the employee—the sale in Japan of gasoline with benzene levels in excess of five percent—and what public policy made that illegal? To establish a clear mandate of public policy, the majority relies principally upon the agreement of the Japanese Petroleum Association, a private industry association. The majority reasons that the policies of this private body are elevated to public policy because Mobil agreed to be bound by the Association's policies. *Ante* at 192–93, 707 *A.*2d at 1015. That Mobil agreed to abide by the policies of the Japanese Petroleum Association may establish company policy, but it surely does not establish the public policy of the United States, the State of New Jersey, or the government of Japan. (Besides, I am not so sure that I would wish the Mobil Oil Corporation to be establishing the public policy of this country and I suspect that a Japanese policy-maker might feel the same way.) A clear mandate of public policy has the effect of law and will be plainly perceived as such. In his dissent in *MacDougall, supra,* our former Chief Justice Wilentz explained that clear mandates of public policy "are general rules" to be "applied uniformly." 144 *N.J.* at 426, 677 *A.*2d 162.

If it is the Court's decision to require a multinational corporation to conform its conduct overseas to the "general rules" imposed by the Court, the ruling poses practical constraints on multinational companies headquartered in New Jersey. Without presuming any familiarity with the specifics, I note that at one time France experimented with the use of ethanol-based fuels containing a benzene content of ten percent. *National Corn Growers Ass'n v. Baker,* 636 *F.Supp.* 921, 930 n. 17 (Ct. Int'l Trade 1986), *rev'd,* 840 *F.*2d 1547 (Fed.Cir.1988). If a New Jersey court were to determine that selling a gasoline product overseas with a benzene content in excess of five percent is against domes-

tic public policy, the New Jersey-based company would not be able to compete in the French market. In effect, New Jersey courts would be exporting their views on how to do business abroad. Congress is free to regulate the overseas activities of domestic companies. *See D'Agostino v. Johnson & Johnson, Inc.*, 133 *N.J.* 516, 534, 628 *A.*2d 305 (1993). I doubt that we are or should.

Determining acceptable levels of benzene in gasoline has been an evolving process. Benzene is naturally found in petroleum. In this country, until the early 1990s, gasoline was sold with benzene levels of up to five percent. *Bly v. Tri–Continental Indus.*, 663 *A.*2d 1232, 1244 n. 9 (D.C.1995). Responding to growing scientific awareness that benzene posed a threat of carcinogenicity, the 1990 Clean Air Act amendments made major strides in the reduction of benzene levels in American gasoline. 42 *U.S.C.A.* § 7545(k)(2)(C). It may be a bit of hindsight now for the Court to emphasize the one-percent limit on benzene in domestic gasoline as evidence that there was in 1989 an equally clear mandate of public policy applicable to Mobil in Japan that forbade the sale of gasoline with five percent or more of benzene. The best that can be said is that there was in 1989 an emerging public policy that because of health risks the benzene content of gasoline be reduced. Contrast this with *D'Agostino* where we identified a clear mandate of public policy warranting the extraterritorial application of our common-law employment law. There we found that Congress clearly intended the Foreign Corrupt Practices Act (FCPA) to reflect a federal policy of preventing "the bribing of foreign officials by domestic companies." *D'Agostino, supra*, 133 *N.J.* at 532, 628 *A.*2d 305. We equated that federal policy to a state policy "especially when a violation ... has an impact on the health and welfare of the state forum." *Ibid.* We concluded that our domestic employment law can "apply extraterritorially only when the underlying clear mandate of public policy is intended to have an extraterritorial effect." *Id.* at 534, 628 *A.*2d 305.

This is not to say that Doctor Mehlman was not an idealistic man or that what he was doing was not right. The point is that,

just like Doctor Pierce, he disagreed with the conduct of an employer that was not clearly proscribed by then existent public policy. *See Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505 ("Research on new drugs may involve questions of safety, but courts should not preempt determination of debatable questions unless the research involves a violation of a clear mandate of public policy."). Moreover, his conduct reflected no clear perception that law was being violated. His offhand, spontaneous remarks, *ante* at 169–70, 707 *A.*2d at 1003, were far short of the forceful and repeated refusals in *Abbamont, supra,* concerning violations of safety requirements. 138 *N.J.* at 410–13, 650 *A.*2d 958.

Observers perceive that the Court's holding will establish the principle that a scientist should not suffer retaliation on account of expressing scientific views that depart from company policy. One wrote: "It's a whistle-blower case. If the guy is a scientist and his figures are correct, he should be able to say what he said. I don't feel he should have been stifled." Franklin Hoke, *Whistle Blower's Legal Victory Seen As Supporting Industry Scientists Who Criticize Their Employers,* The Scientist, Aug. 22, 1994, at 1, 6.[1] This would surely be the case in an ideal world, but the question that the Court must decide is whether these are the employment guarantees that CEPA has created.

I have a sense that this case is idiosyncratic and will not create an unmoored cause of action providing relief for every employee's intra-company dispute over policy.[2] Because Mobil raised defens-

---

[1] In the popularization of events, Dr. Mehlman has been compared to figures such as Karen Silkwood, Frank Serpico, and even to the marshal played by Gary Cooper in the movie "High Noon." Thomas W. Durso, *Fired Whistleblower's Successful Appeal May Broaden State Protection Statutes,* The Scientist, Sept. 2, 1996, at 1, 9. In life, it is not always so easy to see the white hats as it is in cinema.

[2] In *MacDougall, supra,* the Court listed the cases to that effect:

*DeVries v. McNeil Consumer Prods. Co.,* 250 *N.J.Super.* 159, 172, 593 *A.*2d 819 (App.Div.1991) (holding that discharge of employee for having distribut-

es that the jury found to be pretextual, this case never focused on the core issue of whether in 1989 a clear mandate of *public* policy of the United States, the government of Japan, or the State of New Jersey forbade the sale in Japan of gasoline with a benzene content in excess of five percent. Mobil defended Dr. Mehlman's claim on the basis that Mobil had fired Mehlman because he had misused company property to advance his wife's business interests and on the basis that it had never marketed gasoline with a benzene content in excess of five percent. These two defenses were doomed to failure by the facts. In *Velantzas v. Colgate–Palmolive Co.*, we forecast the result of the use of "euphemisms" by personnel managers. 109 *N.J.* 189, 194 n. 2, 536 *A.*2d 237 (1988) ("[F]ailing candidly to state the reasons for a discharge may cloud the factfinding process."). The question is whether we should now close our minds to the fact that the case was incorrectly tried (the trial court did not identify for the jury the clear mandate of public policy) and the fact that plaintiff did not

---

ed "expired" drugs at employer's direction did not violate clear mandate of public policy because the discharge "implicated only the private interests of the parties"); *Schwartz v. Leasametric, Inc.*, 224 *N.J.Super.* 21, 30, 539 *A.*2d 744 (App.Div.1988) (holding that discharge of employee to avoid paying commissions on future transactions did not violate clear mandate of public policy); *Giudice v. Drew Chem. Corp.*, 210 *N.J.Super.* 32, 36, 509 *A.*2d 200 (App.Div.) ("Private investigation of possible criminal activities of fellow employees does not implicate the same public policy consideration as if plaintiffs had been fired as a result of cooperating with law enforcement officials investigating possible criminal activities of fellow employees."), *certif. denied*, 104 *N.J.* 465, 517 *A.*2d 449 (1986); *Alexander v. Kay Finlay Jewelers, Inc.*, 208 *N.J.Super.* 503, 508, 506 *A.*2d 379 (App.Div.) (determining that discharge of employee who filed civil suit against employer to collect allegedly unpaid salary did not violate clear mandate of public policy because there is "no statutory or regulatory proscription against [the] firing"), *certif. denied*, 104 *N.J.* 466, 517 *A.*2d 449 (1986); *Warthen v. Toms River Community Memorial Hosp.*, 199 *N.J.Super.* 18, 28, 488 *A.*2d 229 (App.Div.) (ruling that discharge of nurse for refusing to administer kidney dialysis to terminally ill patient did not violate clear mandate of public policy where employee was motivated by "her own personal morals"), *certif. denied*, 101 *N.J.* 255, 501 *A.*2d 926 (1985).

[144 *N.J.* at 392–93, 677 *A.*2d 162.]

establish a clear mandate of *public* policy in existence in 1989 that proscribed the employer's conduct.

I would not foreclose the possibility that a clear mandate of public policy may have existed in 1989 that made illegal or unethical the employer's conduct. In my view, the Court has not yet identified one. In *MacDougall, supra,* we allowed that possibility (that a clear mandate of public policy might be developed) to occur on a remand. 144 *N.J.* at 405, 677 *A.*2d 162. I would grant a new trial on the basis of the error in this case and allow such an attempt.

Justice HANDLER joins in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices POLLOCK, STEIN and COLEMAN—4.

*Dissenting*—Justices HANDLER and O'HERN—2.