183 N.J. Super. 153 (1982)
443 A.2d 728
SIDNEY B. KALMAN, PLAINTIFF-APPELLANT,
v.
THE GRAND UNION COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 11, 1982.
Decided February 8, 1982.
*154 Before Judges ALLCORN, FRANCIS and MORTON I. GREENBERG.
Manuel Korn argued the cause for appellant.
*155 Robert L. Hollingshead argued the cause for respondent (Pitney, Hardin, Kipp & Szuch, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
Plaintiff appeals from a summary judgment entered in favor of defendant upon plaintiff's complaint seeking compensatory and punitive damages for wrongful discharge. At issue is whether plaintiff falls within the public policy exception to the common law rule that private employees unprotected by contract are terminable at will, as recently stated in Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980).
The essential facts are undisputed for purposes of this appeal. From September 1970 to July 5, 1978 plaintiff was employed by defendant as a pharmacist-in-charge at defendant's pharmacy located in its grocery store in Paramus. At all times plaintiff was registered as a pharmacist under New Jersey law, N.J.S.A. 45:14-1 et seq. The pharmacy section was not separated by partition from the other parts of the store and was not capable of being secured. Hence it did not have a special permit as a pharmacy within a larger retail establishment; rather, defendant's whole store was licensed as a pharmacy. In early June 1978 plaintiff's supervisor, Stanley Brumer, advised plaintiff that the pharmacy would be closed on July 4, 1978, although the rest of the store would be open for business as usual. Being under the impression that state regulations required the pharmacy to be open as long as the store was open, plaintiff objected, citing not only the state regulations but also the possibility that his own license might be suspended or revoked. Brumer "responded that no one would know." At plaintiff's insistence, however, Brumer agreed to check with the State Board of Pharmacy.
Subsequently, Brumer notified plaintiff that the Board of Pharmacy had given its permission to close the pharmacy section on July 4. Apparently disbelieving Brumer, plaintiff telephoned *156 the Board of Pharmacy and learned that, contrary to Brumer's representation, the pharmacy was required to be open as long as the store was open. As a result, the pharmacy was kept open with another pharmacist on duty on July 4. Upon reporting to work on July 5, plaintiff was discharged; no reasons were offered. Plaintiff's essential argument is that a factual issue was presented in his contention that he was discharged solely for attempting to vindicate a state regulation and his own code of professional ethics.
The trial judge granted defendant's motion for summary judgment, reasoning that the administrative regulations and code of ethics which plaintiff felt that he was vindicating were not clear expressions of public policy such as to qualify under the exception recognized in Pierce, supra. In that case plaintiff Pierce was a doctor employed as a research director for defendant. She alleged that she was forced to resign when she was removed from a project involving research on a drug containing saccharin. Citing the medical controversy over the safety of saccharin, she had opposed continued development of the drug. She grounded her objections upon the following clause of the Hippocratic oath: "I will prescribe regimen for the good of my patients according to my ability and my judgment and never do harm to anyone." Id. at 74. She did not, the court was careful to point out, invoke her professional code of ethics or any statute or possible tort liability. Id. at 64, 74.
The Pierce court acknowledged that in an appropriate case the traditional rule allowing termination of "at will" employees without cause might yield to public policy. Id. at 72. The task of a court is to distinguish between public policy and the employee's own values; the latter would not entitle the employee to immunity from discharge:
Employees who are professionals owe a special duty to abide not only by federal and state law, but also by the recognized codes of ethics of their professions. That duty may oblige them to decline to perform acts required by their employers. However, an employee should not have the right to prevent his or her employer from pursuing its business because the employee perceives that *157 a particular business decision violates the employee's personal morals, as distinguished from the recognized code of ethics of the employee's profession. [Id. at 71-72; citation omitted].
It is the employee's burden to identify "a specific expression" or "a clear mandate" of public policy which might bar his discharge. Id. at 72. What constitutes a qualifying mandate is a fact question:
The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy. However, not all such sources express a clear mandate of public policy. For example, a code of ethics designed to serve only the interests of a profession or an administrative regulation concerned with technical matters probably would not be sufficient. Absent legislation, the judiciary must define the cause of action in case-by-case determinations. [Ibid., emphasis supplied]
In the instant case plaintiff was not motivated by his personal values or conscience, but rather by his perception of his professional obligations. Thus, in his complaint he averred that the July 4 closing "would be a violation of the rules regulating the practice of pharmacy and would place him in jeopardy with the Board of Pharmacy and expose him to the risk of suspension or revocation of his license." But the question remains whether those rules qualify as a clear mandate of public policy, or, instead, whether they were designed "to serve only the interests of" the pharmacy profession or concern only "technical matters." Pierce, supra, 84 N.J. at 72.
The practice of pharmacy is regulated by N.J.S.A. 45:14-1 et seq. There is no specific provision in the act governing the type of closing planned by defendant, nor is there any restriction on operating a pharmacy within larger retail premises. Plaintiff relies on N.J.S.A. 45:14-30 to 33 as the source of public policy which motivated him. N.J.S.A. 45:14-30 prohibits the transaction of any business under the name of "pharmacy," "drug store" or similar enumerated terms, unless the premises are "managed at all times by a registered pharmacist." N.J.S.A. 45:14-31 permits ownership by a nonpharmacist, as long as a pharmacist is always "in charge." Under N.J.S.A. 45:14-32, plaintiff points out, "pharmacy" or "drug store" is defined as a *158 business required by the act to be managed by a registered pharmacist. And N.J.S.A. 45:14-33 stipulates such management by a pharmacist as a prerequisite for issuance of a permit to operate the pharmacy. It is undisputed that the pharmacy permit herein extended to the whole store, since the pharmacy section was not physically separable as allowed by N.J.A.C. 13:39-9.14. Hence both parties concede that a registered pharmacist had to be on duty whenever the store was open, and the pharmacy area could not be closed while the rest of the premises were open. Defendant, of course, urges that its concededly prohibited plan for July 4 did not so implicate public policy as to immunize plaintiff from discharge for exposing the plan.
Plaintiff argues persuasively that the requirement that the pharmacy area be open and tended by a pharmacist whenever the premises are open is, indeed, an expression of public policy. An unsecured, unsupervised drug counter creates a risk that potentially dangerous substances will be dispensed by unqualified persons or stolen by patrons. The purpose of requiring that pharmacists be registered is to protect the public from the dangers attendant upon the sale of drugs by unqualified persons. Bd. of Pharmacy v. Quackenbush & Co., 22 N.J. Misc. 334, 335, 39 A.2d 28 (C.P. 1940). Thus plaintiff is correct that he was vindicating a clear mandate of public policy when he reported defendant's plan to the Board of Pharmacy. We note that a Board of Pharmacy regulation imposed upon him the duty of so reporting: the pharmacist-in-charge is responsible for, "[e]nsuring compliance with the provisions of the Pharmacy Act, rules of the Board of Pharmacy and the Controlled Dangerous Substances Act." N.J.A.C. 13:39-8.14(b)16.
The other alleged source of public policy is the Code of Ethics of the American Pharmaceutical Association. Plaintiff invokes the following paragraph from that code:
A PHARMACIST has the duty to observe the law, to uphold the dignity and honor of the profession, and to accept its ethical principles. He should not engage in any activity that will bring discredit to the profession and should expose, without fear or favor, illegal or unethical conduct in the profession. [Emphasis supplied]
*159 We have no doubt that plaintiff was required by this code to report defendant's attempt to flout state regulations. We disagree with defendant that this ethical obligation falls within the Pierce category of one which is "designed to serve only the interests of" the pharmacy profession, as opposed to the interests of the public. As discussed earlier, defendant's proposed closing would have exposed the public to the risk that dangerous drugs might be accessible to the public if no pharmacist were present. This is an instance where a code of ethics coincides with public policy. Under Pierce, therefore, that code justified plaintiff's action and rendered the discharge voidable as contrary to public policy.
We conclude that plaintiff's discharge, if it resulted from defendant's actions as alleged by plaintiff, conflicts with two sources of public policy: (1) the statutory and regulatory scheme required a pharmacist on duty whenever defendant's premises were open and (2) plaintiff's professional code of ethics. We reverse the grant of the summary judgment and remand for a trial at which the plaintiff may be afforded an opportunity to establish his allegations that his discharge in fact resulted from the reasons alleged in his complaint.
Reversed and remanded. We do not retain jurisdiction.