63 A.3d 230

JAMES HITESMAN, PLAINTIFF–APPELLANT/CROSS–RESPON-
DENT, v. BRIDGEWAY INC., D/B/A BRIDGEWAY CARE CEN-
TER, DEFENDANT–RESPONDENT/CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued November 26, 2012—Decided March 22, 2013.

Before Judges GRAVES, ESPINOSA and GUADAGNO.

*Paul Castronovo* argued the cause for appellant/cross-respondent (*Castronovo & McKinney, LLC,* attorneys; *Mr. Castronovo,* of counsel and on the briefs; *Megan Frese Porio,* on the brief).

*Craig S. Provorny* argued the cause for respondent/cross-appellant (*Herold Law, P.A.,* attorneys; *Mr. Provorny,* on the briefs).

The opinion of the court was delivered by

ESPINOSA, J.A.D.

A licensed or certified health care professional may assert a claim against his or her employer pursuant to the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, based upon a reasonable belief that the employer's conduct "constitutes improper quality of patient care[.]" *N.J.S.A.* 34:19–3a(1) and c(1). The statutory definition of "improper quality of patient care" includes the violation of "any professional code of ethics." *N.J.S.A.* 34:19–2(f). In this appeal, we consider whether plaintiff's proof, and specifically his reliance upon a professional code of ethics not applicable to his employer, was sufficient to support a liability verdict in his favor. For the reasons that follow, we conclude that, as a matter of law, plaintiff failed to prove the first element of his CEPA claim.

Plaintiff was terminated from his employment as a registered nurse by defendant, Bridgeway, Inc., d/b/a Bridgeway Care Cen-

ter (defendant or Bridgeway), after he called various governmental agencies and the media to report his concerns about Bridgeway's response to what he considered an inordinate rate of infection among patients. He filed this action, alleging his termination violated CEPA. Plaintiff claimed, and the jury found, he had an objectively reasonable belief that Bridgeway provided "improper quality of patient care," or violated a law or public policy. As support for the reasonableness of his belief, he identified the American Nursing Association's Code of Ethics (the ANA Code of Ethics), Bridgeway's Employee Handbook (the Handbook) and Statement of Residents' Rights. Although the jury returned a liability verdict in plaintiff's favor, it awarded no damages. Plaintiff appeals from the damages verdict and defendant cross-appeals from the liability verdict.

I.

Defendant owns and operates a licensed long-term care nursing home facility, with a sub-acute unit for short-term stays. Plaintiff began working for defendant as a part-time nurse in December 2003, two years after graduating from Raritan Valley Community College. He was required to execute a confidentiality agreement in which he agreed not to reveal confidential patient information and acknowledged that unauthorized disclosure could result in termination of employment.

In January 2008, plaintiff was the evening and weekend shift supervisor at Bridgeway. On January 11, 2008, he circulated the following email to the administrator of Bridgeway and other employees:

To whom it will Concern,

After consulting our Infection control officer, Shiela [sic] Chugani, having received the unit reports, and in light of the increasing rate at which our staff and our residents are succumbing to what is probably respiratory and GI viruses that is prevalant [sic] on all 3 units, I greatly urge that steps be taken to limit further spread of the infection(s). As of this writing, 7 west wing pts have been hospitalized, 15 east wing pts were held on the unit for dinner (between 1st and second sitting). On Pavillion, another 8 pts are showing GI symptoms, and another 7 are showing respiratory symptoms. The evidence requires measures to be taken

to protect our residents. This may take the form of limiting visitations, inter unit activites [sic], and meals to the units for a period of time.

On the same day, plaintiff approached Frances Gerber, the Director of Nursing, and Wayne Blum, Bridgeway's administrator, with an article about an influenza epidemic. There were no cases of influenza in the facility. Nonetheless, Gerber discussed plaintiff's email with Bridgeway's Medical Director, Dr. Anthony Frisoli, who did not agree with plaintiff's assessment. Gerber circulated a reply to plaintiff's email, in which she reminded supervisory personnel "that the mode of transmission is contact" and of the "need to stress the importance of handwashing[.]"

Plaintiff responded with the following email:

Please explain the means and logic by which Dr. Frisoli has determined that the respiratory component of our little epidemic to be solely via physical contact. While clearly, contact precautions and handwa[s]hing will help decrease the rate of infection, I fail to see how ignoring the possibility of airborn[e] infection (coughing, sneezing) and its implications helps to protect our residents and staff. Have any tests/lab work been run? Have any cultures been collected and grown?

The record does not include any response by defendant to this email or any effort by plaintiff to pursue his concerns further with Bridgeway.

On January 14, using a fictitious name, plaintiff contacted the Bridgewater Township Board of Health because he believed "there wasn't enough action being taken by the facility" to address what he considered an inordinate rate of infection. After he was told that the Township had no authority in this area, plaintiff contacted the Somerset County Board of Health (Board of Health), again using a fictitious name, about his concerns.

On January 15, 2008, the Board of Health contacted Gerber and advised it had received a report that there had been a number of major illnesses in the facility and that a number of people had been hospitalized. The Board of Health requested information about the hospitalizations and the symptoms experienced by residents at the facility. Unbeknownst to plaintiff, Gerber gathered the requested information and provided it to the Board of Health the next day.

On January 16, plaintiff placed a call to the New Jersey Department of Health and Social Services (Department of Health). Using the fictitious name again, he stated there was an unaddressed epidemic [1] in the facility. The Department of Health contacted Blum the following day.

Following this telephone call, Gerber asked plaintiff to meet with her and Blum. They asked plaintiff if he had contacted the Board of Health and the Department of Health. He denied doing so. On January 21, Gerber asked plaintiff to meet alone with her. She asked him if he had made the anonymous calls and, once more, he denied doing so.

On January 22, defendant contacted local media and alleged there was an untreated epidemic in the facility. New Jersey Network (NJN) elected to pursue the story. Plaintiff removed administrative logs containing confidential patient information from the facility. He attempted to redact confidential information from the logs and then faxed them to Walter Kane, a reporter with NJN. However, plaintiff's attempt at redaction was not completely successful for he had failed to delete some residents' room numbers, which would have allowed a third party to identify and contact the residents.

On the morning of January 23, Kane confronted Donald Pelligrino, the Chief Executive Officer and an owner of Bridgeway, at the facility. Kane told Pelligrino that an anonymous source reported an outbreak of illness at the facility, resulting in one death, and that Bridgeway was not taking appropriate measures. Kane also showed Pelligrino a copy of the partially redacted administrative logs.

Blum and Gerber met with plaintiff and Denise Zulpa, Director of Human Resources, on January 23. In this meeting, which plaintiff secretly recorded, he admitted contacting the government agencies and the news media. Blum and Gerber questioned

---

[1] On cross-examination, plaintiff acknowledged that his use of the term "epidemic" in his reports to the governmental agencies was incorrect.

plaintiff's basis for concluding the facility was not being run appropriately. Plaintiff stated, "[a]ll I know is that 34 patients had GI symptoms, and we did not take proper procedures or precautions, nor did we seem very motivated to find out what it was."

Blum demanded to know what activity required by State regulation had not been taken. He noted that a report to the State was unnecessary because the thirty-four patients were not all suffering the same symptoms at the same time. Gerber stated that some of the patients with respiratory symptoms had aspiration pneumonia. Plaintiff acknowledged that possibility.

Blum expressed disappointment in plaintiff's lack of confidence in his leadership and said, "I know that everything we had to do we followed state regs and got advice from the state." Gerber stated that plaintiff's "[l]ack of integrity" in lying was a concern. The conversation then turned to the release of the administrative logs, which plaintiff conceded was a violation of the confidentiality policy.

Later that day, plaintiff was suspended with pay pending Bridgeway's investigation of the extent of his disclosures to the media. On January 25, 2008, plaintiff was told his employment was terminated as a result of his contacting the news media and violating both the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 *U.S.C.A.* §§ 1320d–1 to –9, and Bridgeway's confidentiality policy.

Shortly after plaintiff was fired, NJN aired the story on television. Bridgeway gave a rebuttal statement on the same channel on January 31, 2008.

## II.

Plaintiff filed a complaint against Bridgeway. He alleged that he had repeatedly objected to its "improper quality of patient care" and disclosed to government regulators "practices of Defendant that [he] reasonably believed constituted improper quality of

patient care and violations of his professional code of ethics[.]" Plaintiff contended that Bridgeway violated CEPA because his employment was terminated in retaliation for engaging in this protected activity.[2]

In addition to the ANA Code of Ethics, plaintiff identified the Code of Conduct contained in the Handbook and the Statement of Residents' Rights as relevant to the reasonableness of his belief that Bridgeway provided an improper quality of healthcare to its residents. Plaintiff admitted that the ANA Code of Ethics applied to him and did not apply to defendant. He testified that the Handbook required him "to support and comply with the standards of [his] professional licensure ... [and his] ethics and standards as a registered nurse." Plaintiff described the Statement of Residents' Rights as follows:

> It is a document that ensures that everyone understands that just because a patient may not be physically and mentally at their peak, that they also have a right—they still have rights. That a patient still has rights and freedoms to choice [sic] their doctor, choose their care, to participate in their care whenever possible.
>
> Many of the rights have to do with protecting the patient from isolation—any type of social isolation. You know, patient having access to phones, to associate with whom they wish to associate with. Kind of reiteration of the Bill of Rights specifically for patients.

On cross-examination, plaintiff conceded that he did not know better than Dr. Frisoli, Gerber, or the unit managers what precautionary measures were appropriate in January 2008. He explained he "just thought [they] had a difference of opinion." Plaintiff also admitted he had violated the confidentiality policy and could be terminated for doing so.

At the close of plaintiff's case, defendant moved to dismiss the complaint on the ground that plaintiff had failed to prove he had an objectively reasonable belief that Bridgeway provided improper quality of health care or violated a law or public policy, the first element of his CEPA claim. Defense counsel noted that the only authority cited by plaintiff to support the reasonableness of his

---

[2] Plaintiff did not contend that his "going to the media" was a protected activity.

belief was the ANA Code of Ethics which, plaintiff admitted, did not apply to Bridgeway.

Plaintiff's counsel argued that a code of ethics not applicable to defendant could still provide a basis for the requisite reasonable belief. He cited defendant's Code of Conduct in its Employee Handbook and the Statement of Residents' Rights as further support for the reasonableness of plaintiff's belief, and described the relevant portions from these documents:

All these things talk about you should be dedicated to the patient's safety.

They actually say: Dedicated to provide our patients and/or patients' family members with the best quality health care, where we always put safety first.

That could be a clear expression of public policy, and their own handbook incorporates the nursing code of ethics.

Their own handbook says, quote, employees will also be required to comply with all state and federal laws that apply to our facility and your own professional licensure, unquote. . . .

Well, part of that professional licensure is the code of ethics. . . . So the nursing code is definitely a source of law among the handbook and the Code of Conduct.

The defendant's code of conduct similarly requires, quote, sound ethical . . . standards, close quote, and a, quote, sound ethical manner, close quote, of plaintiff and all its employees in caring for its patients. . . .

Moreover, the code emphasizes that [plaintiff] must, quote, follow safe work practices and comply with all applicable safety standards and health regulations[.]

The court agreed with plaintiff's counsel that, although the ANA Code of Ethics did not apply to defendant, it could be used to determine "whether there's improper health care" or to "establish[ ] public policy." Accordingly, defendant's motion was denied.

Plaintiff requested that *Model Jury Charge (Civil)*, 2.32, "New Jersey Conscientious Employee Protection Act," be read to the jury regarding his CEPA claim. The court gave the following instruction regarding the first element of this claim:

To prove the first element of the claim, [plaintiff] must establish that he reasonably believed that Bridgeway's response to what he believed was an increase in gastrointestinal and respiratory symptoms constituted improper quality of health care to its patients in the nursing home or violated some other source of law or a clear mandate of public policy.

[Plaintiff] need not prove that Bridgeway's response actually was improper quality of health care or actually violated the law or a clear mandate of public

policy. Rather, [plaintiff] need only prove that he actually believed that to be the case and whether his belief was objectively reasonable.

Put another way, [plaintiff] need not prove that a law, clear mandate of public policy concerning public health, safety or welfare would have been violated or improper quality of patient care arose if the facts he alleges are true.

The only thing you must decide with respect to this issue is whether [plaintiff] actually held the belief that Bridgeway's response actually was improper quality of health care or actually violated the law or a clear mandate [of] public policy and whether that belief was objectively reasonable.

Now, I charge you that the American Nursing Association's Code of Ethics, Section 3.5, Bridgeway's own Code of Conduct, Bridgeway's Employee Handbook and Bridgeway's Statement of Resident Rights are sources of law or public policy that closely relate to the conduct about which [plaintiff] blew the whistle. These are in evidence for your review.

You need not decide whether the health care at issue here actually violated these sources of law or a clear mandate of public policy. The only thing you must decide is whether [plaintiff] actually believed that Bridgeway's response constituted improper quality of health care to its patients or violated these sources of law or public policy I just described, and if so, whether [plaintiff's] belief was objectively reasonable.

The court did not provide the jurors with the statutory definition of "improper quality of patient care," which required plaintiff to prove he had a reasonable belief that Bridgeway's conduct violated "any law or any rule, regulation or declaratory ruling adopted pursuant to law, or any professional code of ethics." *N.J.S.A.* 34:19–2(f).[3]

---

[3] The Model Jury Charge does not include the definition of "improper quality of patient care." Without the definition, a jury might conclude that a plaintiff could form a reasonable belief that his or her employer had provided an improper quality of patient care without a belief that the employer violated one of the authorities identified in the statute. In our view, this omission deprives the jury of the legal standard necessary to its determination and we refer this issue to the Supreme Court Committee on Model Civil Jury Charges for its consideration.

Moreover, although we conclude that the ANA Code of Ethics, Bridgeway's Code of Conduct and Statement of Residents' Rights could not serve as the source of law or public policy to support plaintiff's claim here, we note that the instruction given to the jury did not specify what portion of those authorities plaintiff believed had been violated as required by the Model Jury Charge.

The first two questions on the verdict sheet asked the jury whether plaintiff had proven "that his belief that Bridgeway provided improper quality of health care or violated the law of public policy was objectively reasonable" and if proven, "that his reporting to the government was a determinative motivating factor in Bridgeway's decision to terminate his employment[.]" The jury answered "Yes" to each of these questions and was therefore instructed by the verdict sheet to proceed to the third question regarding damages.

The third question asked, "Do you find that [plaintiff] is entitled to compensation for past lost pay?" The question was followed by this instruction: "Stop your deliberations. The Court will set the amount of Mr. Hitesman's lost pay." [4] The jury answered "No" to the third question.

After receiving the vote on each question, the court polled the jurors as to their vote on the specific question. Upon receiving the vote on the third question, the court announced, "Based on your verdict, judgment is entered for the defendant." Plaintiff's counsel interjected that he thought there was "some confusion on the jury." A juror said, "Yeah," and asked to say something. The court did not permit the juror to speak. Plaintiff's counsel asked the court to poll the jury "to make sure that ... they realize that voting no on question 3 means [plaintiff] loses the trial and Bridgeway gets a verdict in its favor." The court declined to inquire further, stating there was "absolutely no confusion on the part of the jury as to the questions they answered."

Plaintiff moved for entry of judgment notwithstanding the verdict pursuant to *R.* 4:40–2(b), based on the jury's liability determination. Plaintiff's girlfriend, Mary Walker, submitted a certification in which she stated she overheard four jurors discussing the

---

[4] The parties reached a stipulation that $59,000 represented the amount of lost wages available to plaintiff as compensatory damages. During the course of her charge to the jury, the judge stated the parties had agreed that the amount provided in this question would be the amount of lost pay, and that the jury need not deliberate on the amount of compensation.

result of the trial, expressing confusion, and that they apologized to her about the result. Both this motion and a motion for reconsideration were denied. Bridgeway also moved for a judgment notwithstanding the verdict on liability, which was denied.

In his appeal, plaintiff argues that the trial court erred in dismissing the jury without resolving "the jury's inconsistent verdict of liability without the stipulated damages" as required by *Rule* 4:39–2. He argues that the fleeting reference in the charge to stipulated damages confused the jury; that the jury intended to award him damages; and that the court erred in failing to instruct the jury regarding the inconsistency of the verdict and in failing to require further deliberation. In its cross-appeal, defendant argues that the liability verdict was against the weight of the evidence. After reviewing the record and the parties' arguments in light of the applicable legal principles, we are satisfied that plaintiff failed to prove his claim as a matter of law and that the liability verdict was contrary to the weight of the evidence. Accordingly, we reverse the liability verdict in favor of plaintiff and need not address his remaining arguments.

### III.

CEPA is "designed to protect employees who blow the whistle on illegal or unethical activity committed by their employers or co-employees." *Estate of Roach v. TRW, Inc.*, 164 *N.J.* 598, 609–10, 754 *A.*2d 544 (2000).[5] *N.J.S.A.* 34:19–3 provides, in pertinent part:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

[5] CEPA is recognized as a codification of principles articulated in *Pierce v. Ortho Pharm. Corp.*, 84 *N.J.* 58, 72, 417 *A.*2d 505 (1980). *Barratt v. Cushman & Wakefield of N.J., Inc.*, 144 *N.J.* 120, 126, 675 *A.*2d 1094 (1996); *Young v. Schering Corp.*, 141 *N.J.* 16, 26, 660 *A.*2d 1153 (1995) (stating CEPA represents "a partial codification" of the common law prohibition against the retaliatory discharge of at-will employees).

a. Discloses ... to a public body an activity, policy or practice of the employer ... that the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, ... or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; ...

....

c. Objects to ... any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, ... or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care; [or]

....

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

As noted, "improper quality of patient care" is a defined term in the statute. It applies to an employer that is a health care provider and means "any practice, procedure, action or failure to act [with respect to patient care] ... which violates any law or any rule, regulation or declaratory ruling adopted pursuant to law, or any professional code of ethics." *N.J.S.A.* 34:19–2(f).[6] Plaintiff has not identified any law, or rule or regulation promulgated pursuant to law, or declaratory ruling adopted pursuant to law that he reasonably believed Bridgeway had violated. To the extent his CEPA claim alleged violations of a(1) or c(1), it therefore rests upon a claim that he reasonably believed that Bridgeway's conduct constituted improper quality of patient care because it violated a professional code of ethics.

Therefore, the four essential elements applicable to plaintiff's CEPA claim are: (1) he reasonably believed that his employer's conduct violated either "any professional code of ethics" or, under

---

[6] Although the principles applicable to CEPA claims generally and those based on "improper quality of patient care" are the same, the authorities cited in the statute differ slightly. In addition to "a law, or a rule or regulation promulgated pursuant to law," an improper patient care claim may be based upon a reasonable belief that employer conduct has violated any "declaratory ruling adopted pursuant to law, or any professional code of ethics." Unless specific reference is required, we refer to the authorities identified in the statute as the relevant or identified legal authority to avoid confusion.

c(3), a clear mandate of public policy; (2) he performed a "whistle-blowing" activity described in *N.J.S.A.* 34:19–3; (3) an adverse employment action was taken against him; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. *See Dzwonar v. McDevitt,* 177 *N.J.* 451, 462, 828 *A.*2d 893 (2003); *Klein v. Univ. of Med. & Dentistry of N.J.,* 377 *N.J.Super.* 28, 38, 871 *A.*2d 681 (App.Div.), *certif. denied,* 185 *N.J.* 39, 878 *A.*2d 856 (2005).

Defendant stipulated that plaintiff performed a whistle-blowing activity in calling the governmental agencies and that his termination constituted the requisite adverse employment action, thus satisfying the second and third elements of plaintiff's claim. The issue here is whether plaintiff satisfied the first prong of his CEPA claim, which required him to "set forth facts that would support an objectively reasonable belief that a violation has occurred." *Dzwonar, supra,* 177 *N.J.* at 464, 828 *A.*2d 893.

■ In furtherance of its purpose to protect and encourage whistleblowers, CEPA is not intended "to make lawyers out of conscientious employees...." *Mehlman v. Mobil Oil Corp.,* 153 *N.J.* 163, 193, 707 *A.*2d 1000 (1998). Therefore, a plaintiff is not required to show that the relevant legal authority or clear mandate of public policy "actually would be violated if all the facts he or she alleges are true." *Dzwonar, supra,* 177 *N.J.* at 464, 828 *A.*2d 893. Rather, the plaintiff must "set forth facts that would support an objectively reasonable belief that a violation has occurred." *Ibid.*

■ Proof of such a factual basis begins with the identification of the relevant legal authority or public policy the plaintiff believes his or her employer violated. Before a CEPA claim may be submitted to a jury, the court must identify a legal authority recognized in the statute "that *closely relates* to the complained-of conduct[,]" *id.* at 463, 828 *A.*2d 893 (emphasis added), and "make a threshold determination that there is a *substantial nexus* between the complained-of conduct and a law or public policy identified...." *Id.* at 464, 828 *A.*2d 893 (emphasis added). "The trial

court can and should enter judgment for a defendant when no such law or policy is forthcoming." [7] *Id.* at 463, 828 *A.*2d 893. If the court finds a substantial nexus, the CEPA claim is submitted to the jury. The jury must then decide "whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable." *Id.* at 464, 828 *A.*2d 893.

It is not enough for an employee to rest upon a sincerely held—and perhaps even correct—belief that the employer has failed to follow the most appropriate course of action, even when patient safety is involved. A plaintiff cannot rely upon "a broad-brush allegation of a threat to patients' safety[,]" because CEPA affords no protection for the employee who simply disagrees with lawful policies, procedures or priorities of the employer. *Klein, supra,* 377 *N.J.Super.* at 42–43, 871 *A.*2d 681 (stating that CEPA was "not intended to shield a constant complainer who simply disagrees with the manner in which the hospital is operating one of its medical departments, provided the operation is in accordance with lawful and ethical mandates"); *see also Schechter v. N.J. Dep't of Law & Pub. Safety, Div. of Gaming Enforcement,* 327 *N.J.Super.* 428, 432, 743 *A.*2d 872 (App.Div.2000) (finding no viable CEPA claim in case that "involves nothing more than a policy dispute"); *Young v. Schering Corp.,* 275 *N.J.Super.* 221, 237, 645 *A.*2d 1238 (App.Div.1994) (CEPA "was not intended to provide a remedy for wrongful discharge for employees who simply disagree with an employer's decision, where that decision is entirely lawful"), *aff'd,* 141 *N.J.* 16, 660 *A.*2d 1153 (1995); *Warthen v. Toms River Cmty. Mem'l Hosp.,* 199 *N.J.Super.* 18, 28, 488 *A.*2d 229 (App.Div.) (ruling that discharge of nurse for refusing to administer kidney dialysis to terminally ill patient did not violate clear mandate of public policy where employee was motivated by "her own personal morals"), *certif. denied,* 101 *N.J.* 255, 501 *A.*2d 926 (1985). The employee "must have an 'objectively reasonable

---

[7] Therefore, because plaintiff did not identify any law or rule or regulation promulgated pursuant to law that he believed defendant had violated, his claim based upon "a violation of law" should not have been submitted to the jury.

belief' " that a violation of the relevant legal authority occurred, "rather than an objection based on some other principle, no matter how deeply believed[.]" *McLelland v. Moore*, 343 *N.J.Super.* 589, 600, 779 *A.*2d 463 (App.Div.2001), *certif. denied*, 171 *N.J.* 43, 791 *A.*2d 221 (2002); *see also Mehlman, supra*, 153 *N.J.* at 193, 707 *A.*2d 1000.

Therefore, to prove his claim based upon an allegation of "improper quality of patient care" under *N.J.S.A.* 34:19–3a(1) or c(1), plaintiff was first required to identify the professional code of ethics that he believed Bridgeway violated. To support his claim under *N.J.S.A.* 34:19–3c(3), plaintiff was required to identify "a clear mandate of public policy concerning the public health, safety or welfare" with which he reasonably believed Bridgeway's conduct was incompatible. *See Dzwonar, supra*, 177 *N.J.* at 462, 828 *A.*2d 893; *Mehlman, supra*, 153 *N.J.* at 187–88, 707 *A.*2d 1000; *Schechter, supra*, 327 *N.J.Super.* at 431, 743 *A.*2d 872. However, further inquiry is required because the mere identification of an authority does not alone provide adequate support for an objectively reasonable belief that a violation has occurred.

In *Dzwonar*, the plaintiff was terminated from her employment as a paid arbitration officer by Local 54 of the Hotel and Restaurant Employees International Union after she repeatedly objected to the Executive Board's refusal to read its minutes at the general membership meetings. 177 *N.J.* at 456, 828 *A.*2d 893. She identified specific provisions of the Labor Management Reporting and Disclosure Act (LMRDA), 29 *U.S.C.A.* §§ 401 to –531, as well as the Union's bylaws and a public policy that she believed the Union had violated. *Id.* at 465–66, 828 *A.*2d 893. The identified authorities related to the Union's relationship with its members. Yet, the Court analyzed each of the authorities identified in turn and concluded that none provided adequate support for an objectively reasonable belief that defendants had violated a law.

The Court first addressed the plaintiff's reliance upon section 101(a)(1) of the LMRDA. To establish a claim under that section, "a union member must allege a denial of rights accorded to other

members[.]" *Id.* at 466, 828 *A.*2d 893 (internal quotation marks omitted). Because the plaintiff's claim did not concern such a denial of rights to others, but "only a disagreement regarding access to information[,]" the Court found no "close relationship" between plaintiff's claims and the statute relied upon as support for her CEPA claim. *Id.* at 467, 828 *A.*2d 893. The Court therefore concluded, "plaintiff's belief that defendants' actions were in violation of section 101(a)(1) of the LMRDA was not objectively reasonable." *Ibid.*

The Court then turned to plaintiff's argument that she reasonably believed defendants violated section 101(a)(2) of the LMRDA, which grants union members "the right to meet and assemble freely with other members; and to express any views, arguments, or opinions[.]" 29 *U.S.C.A.* § 411(a)(2). The Court found that, because plaintiff failed to identify any conduct by defendants that implicated those protections, "she did not possess an objectively reasonable belief that defendants' actions violated section 101(a)(2)" as a matter of law. *Dzwonar, supra*, 177 *N.J.* at 467–68, 828 *A.*2d 893.

Next, the Court considered plaintiff's claim that she reasonably believed defendants' failure to explain their actions more fully to the general membership violated section 501(a) of the LMRDA. The Court dismissed this as a "dispute concern[ing] the adequacy of the Union's internal procedures" and concluded "as a matter of law that plaintiff did not possess an objectively reasonable belief that section 501 of LMRDA was violated." *Id.* at 468, 828 *A.*2d 893.

The Court rejected the plaintiff's reliance upon an alleged violation of the Union's bylaws because such bylaws are not included among the authorities enumerated in *N.J.S.A.* 34:19–3c(1), which requires her objection to be based upon a reasonable belief that defendants' conduct violated "a law, or a rule or regulation promulgated pursuant to law[.]" *Id.* at 469, 828 *A.*2d 893. The Court concluded that this claim should have been precluded by the trial court. *Ibid.* Finally, the Court rejected

plaintiff's claim that her termination violated a clear mandate of public policy, stating it could not identify such a policy. *Ibid.*

The Court's analysis in *Dzwonar* makes it clear that, once the relevant legal authority is identified, the plaintiff's factual allegations must be evaluated in light of that authority to determine whether the plaintiff possessed an objectively reasonable belief that a cognizable violation occurred. *See McLelland, supra,* 343 *N.J.Super.* at 600, 779 *A.*2d 463; *Mehlman, supra,* 153 *N.J.* at 193, 707 *A.*2d 1000; *Klein, supra,* 377 *N.J.Super.* at 40, 871 *A.*2d 681. No cognizable violation can occur if the authority relied upon is not one specified in the statute. *See Dzwonar, supra,* 177 *N.J.* at 469, 828 *A.*2d 893. While proof of a violation is unnecessary, the required "close relationship" between a claim and the authority identified cannot exist when an element necessary to a claim under that authority is not present, *see id.* at 467, 828 *A.*2d 893, or the protection afforded by the authority does not apply to the employee's claim. *Id.* at 467–68, 828 *A.*2d 893. Under such circumstances, the employee lacks an objectively reasonable belief of a violation as a matter of law.

## IV.

In this case, the conduct complained of was "Bridgeway's response" to what plaintiff believed was an increase in gastrointestinal and respiratory symptoms. As noted, plaintiff did not identify any law or any rule, regulation or declaratory ruling adopted pursuant to law that he believed defendant had violated. He identified the relevant authorities as Section 3.5 of the ANA Code of Ethics, the Code of Conduct contained in the Handbook, and the Statement of Residents' Rights.

## A.

Neither the Code of Conduct nor the Statement of Residents' Rights qualify as "any law or any rule, regulation or declaratory ruling adopted pursuant to law or any professional code of ethics." *N.J.S.A.* 34:19–2(f). Therefore, neither may support an objective-

ly reasonable belief that Bridgeway's conduct constituted an improper quality of patient care under *N.J.S.A.* 34:19–3a(1) or c(1). *See Dzwonar, supra,* 177 *N.J.* at 469, 828 *A.*2d 893 ("[B]ylaws are not a 'law, rule or regulation' pursuant to CEPA[.]").[8]

## B.

Because *N.J.S.A.* 34:19–2(f) includes "any professional code of ethics," plaintiff's reliance upon the ANA Code of Ethics does not die on the threshold of the statutory definition. The question remains whether the ANA Code of Ethics can support an objectively reasonable belief that Bridgeway violated it.

As plaintiff acknowledged, the ANA Code of Ethics does not apply to Bridgeway. He contended, however, that it could provide a basis for a CEPA claim, in part because the ANA Code of Ethics was incorporated in Bridgeway's Handbook.

The trial court accepted plaintiff's argument that "any code of ethics," even one not applicable to the employer, could support a plaintiff's reasonable belief of a violation, relying upon *Kalman v. Grand Union Co.,* 183 *N.J.Super.* 153, 443 *A.*2d 728 (App.Div. 1982), in which liability was found against defendant, a grocery store, for violation of a code of ethics applicable to pharmacists. This reliance was misplaced both legally and factually. *Kalman* was decided prior to CEPA and therefore did not entail an interpretation of the statutory definition of "any professional code of ethics." *See N.J.S.A.* 34:19–2(f). Moreover, because the entire Grand Union store was licensed as a pharmacy, it was subject to the code of ethics and statutes applicable to pharmacists. *Kalman, supra,* 183 *N.J.Super.* at 155, 443 *A.*2d 728.

The section of the ANA Code of Ethics relied upon by plaintiff provides guidance to nurses who become aware of "instances of

---

[8] Accordingly, the trial court erred when it instructed the jury that "Bridgeway's own Code of Conduct, Bridgeway's Employee Handbook and Bridgeway's Statement of Resident Rights are *sources of law* ... that closely relate to the conduct about which [plaintiff] blew the whistle." (Emphasis added).

incompetent, unethical, illegal, or impaired practice" in the provision or denial of health care. Its purpose is to inform nurses on the proper discharge of their responsibility as patient advocates under such circumstances. Even as "incorporated" in Bridgeway's Handbook, the ANA Code of Ethics provided standards for *employees* to follow.

Here, plaintiff questioned the quality of care provided by Bridgeway. The section of the ANA Code of Ethics may provide guidance for a determination of whether plaintiff acted in compliance in expressing his concerns, but the question of his own compliance is irrelevant. Even if he had complied with the Code, such compliance would shed no light on whether his concerns were based upon a purely subjective disagreement or an objectively reasonable belief that his employer engaged in misconduct. More important, the ANA Code of Ethics establishes no standard regarding the patient care Bridgeway was required to provide to its patients. As a result, plaintiff's belief that Bridgeway acted in violation of the ANA Code of Ethics was not objectively reasonable as a matter of law. *See Dzwonar, supra,* 177 *N.J.* at 465–68, 828 *A.*2d 893.

### C.

We next turn to plaintiff's claim that he reasonably believed Bridgeway's conduct was "incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment[,]" *N.J.S.A.* 34:19–3c(3). His reliance upon the ANA Code of Ethics, the Code of Conduct and Statement of Residents' Rights remains inadequate to support the first prong of this claim as well.

To sustain a CEPA claim, "the mandate of public policy [must] be clearly identified and firmly grounded" and must not be "vague, controversial, unsettled, [or] otherwise problematic[.]" *See Mehlman, supra,* 153 *N.J.* at 181, 707 *A.*2d 1000 (quoting *MacDougall v. Weichert,* 144 *N.J.* 380, 391–92, 677 *A.*2d 162 (1996)). In addition, "the complained of activity must have public

ramifications, and ... the dispute between employer and employee must be more than a private disagreement." *Maw v. Advanced Clinical Commc'ns, Inc.*, 179 *N.J.* 439, 445, 846 *A.*2d 604 (2004).

"[S]ources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy." *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505. Although a clear mandate of public policy under *N.J.S.A.* 34:19–3c(3) is not limited to policy expressed in a statute, rule or regulation promulgated pursuant to law,

> a "clear mandate of public policy" conveys a legislative preference for a readily discernible course of action that is recognized to be in the public interest. A "clear mandate" of public policy suggests an analog to a constitutional provision, statute, and rule or regulation *promulgated pursuant to law* such that, under Section 3c(3), there should be a high degree of public certitude in respect of acceptable [versus] unacceptable conduct.
>
> [*Maw, supra,* 179 *N.J.* at 444, 846 *A.*2d 604.]

As we have noted, the section of the ANA Code of Ethics relied upon by plaintiff provides guidance to nurses in their roles as patient advocates. Although, arguably, it is not designed "to serve only the interests of a profession[,]" *see Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505, it neither expresses any policy based upon a constitutional provision, statute, rule or regulation promulgated pursuant to law, nor provides a standard that clearly delineates "acceptable [versus] unacceptable conduct." *See Maw, supra,* 179 *N.J.* at 444, 846 *A.*2d 604.

However, even if the ANA Code of Ethics were considered a "clear mandate of public policy," plaintiff has identified no "incompetent, unethical, illegal, or impaired practice" by Bridgeway that would implicate the Code. Further, plaintiff has not identified any action by Bridgeway that was incompatible with any expression of policy in the Code. To the contrary, the evidence showed that Bridgeway responded to plaintiff's emails and took no action to thwart plaintiff from taking any action suggested by the ANA Code of Ethics.

The Code of Conduct and the Statement of Residents' Rights similarly fail to reflect a clear mandate of policy. Generalized statements about a commitment to "the best quality health care" and requirements that employees comply with all applicable statutes, regulations and ethical standards are far too vague to provide "a high degree of public certitude in respect of acceptable [versus] unacceptable conduct." *See ibid.* As the Court observed in *Maw,* the Legislature's requirement that there be "a 'clear' mandate of public policy bespeaks a desire not to have CEPA actions devolve into arguments between employees and employers over what is, and is not, correct public policy." *Ibid.*[9]

We are therefore satisfied that plaintiff lacked an objectively reasonable belief that Bridgeway engaged in conduct that was incompatible with a clear mandate of public policy based on the ANA Code of Ethics, the Code of Conduct or the Statement of Residents' Rights. Because he lacked an objectively reasonable belief that Bridgeway's conduct constituted improper quality of patient care or violated public policy, plaintiff failed to satisfy the first prong of his CEPA claim as a matter of law. In short, as plaintiff testified, his dispute with his employer was just "a difference of opinion."

The verdict in plaintiff's favor on liability is reversed.

---

[9] Therefore, the trial court erred when it instructed the jury that "the American Nursing Association's Code of Ethics, Section 3.5, Bridgeway's own Code of Conduct, Bridgeway's Employee Handbook and Bridgeway's Statement of Resident Rights are sources of ... public policy that closely relate to the conduct about which [plaintiff] blew the whistle."