Justice ALBIN,
dissenting.
Plaintiff James Hitesman, a registered nurse, claimed defendant Bridgeway Care Center terminated his employment because he complained to his supervisors and governmental authorities about the nursing home’s failure to take standard precautions to address an incipient, life-threatening outbreak of infection among the facility’s elderly patients and staff. Hitesman contended that Bridgeway’s retaliatory firing for his whistleblowing activities violated the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8.
In denying Bridgeway’s motion for an involuntary dismissal at the end of Hitesman’s case, the trial court did exactly what is asked of all courts deciding such motions — it looked at the evidence in the light most favorable to the non-moving party, Hitesman. Based on that standard, the court concluded that Hitesman established the elements of a cause of action under CEPA. The court found evidence to support the conclusion that Hitesman reasonably believed that Bridgeway was violating laws and regulations governing the proper quality of patient care, that he reported Bridgeway’s violations to the appropriate authorities, and that he was fired for doing so.
The majority has simply ignored the record in overturning the trial court’s decision. The record clearly reveals that Hitesman testified about violations of “standard precautions” concerning infection control reflected in federal and state healthcare law and that the trial court relied on his testimony and those sources of law in denying Bridgeway’s motion to dismiss. The majority’s *43 assertion that Hitesman was merely expressing his personal views on the proper quality of patient care is not borne out by the record — and certainly not by a reading of the record that gives Hitesman the benefit of all favorable inferences.
I therefore respectfully dissent. In doing so, I will turn to those portions of the record either omitted or barely mentioned in the majority’s opinion. I will let the record speak for itself.
I.
To support a CEPA claim under N.J.S.A. 34:19-3(a), (c)(1), or (c)(3), plaintiff must establish that he reasonably believed an activity, policy, or practice of his employer constituted improper quality of patient care, contrary to law or a clear mandate of public policy, and that his employer fired him for his whistleblowing. The plaintiff does not have to show that his employer “actually violated the law or a clear mandate of public policy.” Dzwonar v. McDevitt, 177 N.J. 451, 462, 828 A.2d 893 (2003). So long as a plaintiff has an objectively reasonable belief that his employer has done so, the plaintiff is protected even if he is mistaken. Id. at 464, 828 A.2d 893. CEPA’s intent “is not to make lawyers out of conscientious employees” who report conduct “that they reasonably believe to be unlawful.” Mehlman v. Mobil Oil Carp., 153 N.J. 163, 193-94, 707 A.2d 1000 (1998). Rather, CEPA’s intent is to prevent retaliation against employees who make good-faith objections. Ibid.
II.
A.
The majority asserts that Hitesman’s trial testimony only “briefly alluded to, but did not identify, ‘standard precautions’ ” deriving from federal and state law. Ante at 40, 93 A.3d at 325. The record says otherwise.
Hitesman testified that, as a nurse, he was obliged “to protect the patients” in the Bridgeway facility and to ensure that “quality *44 of care” standards were followed, particularly those standards related to “infection control.” He was alarmed about an outbreak of respiratory and gastrointestinal infections within the facility and about Bridgeway’s failure to implement “standard precautions” to control the spread of those infections. For example, Bridgeway officials did not take basic steps to isolate infected residents, such as closing the communal dining hall. As Hitesman explained, “[pjutting all these people together to possibly contaminate each other ... posed a risk.”
In his testimony, Hitesman unmistakably identified the Centers for Disease Control and Prevention (CDC) and state law as sources for his reference to “standard precautions.” Here is what Hitesman said in response to questioning:
Q. And these standard precautions come from where?
A. They come from the CDC. And State policies, from the health department. ...
Q. What CDC policies?
A. CDC policies on infection control.
Q. For what in? They have different—
A. Well, they have ... the general policies for infection control which are called standard precautions.
Q. Okay.
And tell me in what instance are you suppose to use masks under the infection control from the CDC?
A. When you have evidence of some type of — some type of illness that is being spread through other vectors. In the case of a mask you are looking at airborne mode of transportation, droplets, aerosol, that kind of thing.
Hitesman repeatedly explained the nature of the “standard precautions” for infection control:
Q. [Y]ou said before that you ... closed the main dining room and you gave masks for the staff.
Is that correct?
A. Correct.
Q. Did you do anything else with the staff to act on your concerns?
A. I reminded them of basic standard precautions, washing hands, infection controls, whatever barriers you might need depending upon what the symptoms were that were presented____
Q. Wfhat infection control procedure did you go over with the staff?
*45 A. Well. Pardon me. The basic — basic standards are standard precautions. You always assume a patient is infected even when there is no infection. It tells you when to wash your hands, use gloves. You wash your hands before and after dealing with the residents. After toileting a resident, cleaning a resident up. When to use gloves. When not to use gloves. That kind of thing.
And then we went over more advanced techniques.
If patients were showing symptoms of lots of vomiting and diarrhea, GI symptoms, then they might require gowns. If they were dealing with a patient that was sneezing and coughing a lot, it might require gloves, maybe even goggles, depending on what was going on.
In discussing the responsibilities of the Bridgeway infection control coordinator, Hitesman again referenced the CDC “standard precautions”:
Q. What [were] the duties of the infection control coordinator?
A. Her duties would have been to educate the staff on basic infection control standard precautions as laid out by the CDC, as well as advanced techniques for infection control for patients that required isolation.
[ (Emphasis added).]
Additionally, Hitesman testified that during the course of the outbreak at the Bridgeway facility, he gave Director of Nursing Frances Gerber, a registered nurse, an article from the CDC on influenza. The article “addressed droplets and airborne viruses and procedures on how to prevent airborne infections.” Although Hitesman was not specifically concerned about a flu outbreak, he believed that the CDC article “was just an example of how to control infection.”
Despite Hitesman’s testimony, the majority insists that “he revealed neither the name nor the contents of the CDC guidelines and state policies, and offered no document constituting or relating to such guidelines and policies into evidence.” Ante at 40-41, 93 A.3d at 325. Hitesman’s testimony, however, sufficiently identified the relevant CDC guidelines applicable to Bridgeway as a healthcare facility. CEPA does not require that a plaintiff in his testimony give the precise statutory citation of the law that he reasonably believes his employer is violating. Indeed, the law or public policy that plaintiff reasonably believes his employer is violating may be “identified by the court or the plaintiff.” Dzwonar, supra, 177 N.J. at 464, 828 A.2d 893.
*46 The majority cites no legal authority for the new demands it places on CEPA plaintiffs. Until today, “[t]he object of CEPA [was] not to make lawyers out of conscientious employees.” Mehlman, supra, 153 N.J. at 193, 707 A.2d 1000. Until today, no case required a plaintiff to make a hard copy of a federal or state statute or regulation, such as the CDC guidelines, and place or read it into evidence. Here, the court referred to and quoted the applicable law in its summary-judgment opinion, which was incorporated in the court’s involuntary-dismissal decision.
B.
The CDC “standard precautions” identified and described by Hitesman are a set of instructions for infection control in healthcare facilities. See Healthcare Infection Control Practices Advisory Committee, 2007 Guideline for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings 66 (2007) [hereinafter Guideline for Isolation Precautions], available at http://www.cdc.gov/hicpac/pdi/isolation/Isolation2007.pdf. The standard precautions are
a group of infection prevention practices that apply to all patients, regardless of suspected or confirmed infection status, in any setting in which healthcare is delivered____ These include: hand hygiene; use of gloves, gown, mask, eye protection, or face shield, depending on the anticipated exposure; and safe injection practices. Also, equipment or items in the patient environment likely to have been contaminated with infectious body fluids must be handled in a manner to prevent transmission of infectious agents.

[Ibid.]

The standard precautions are regarded by the CDC as “the primary strategy for the prevention of healthcare-associated transmission of infectious agents among patients and healthcare personnel.” Ibid, (emphasis omitted). How the standard precautions apply in any given case is determined by the nature of the healthcare interactions “and the extent of anticipated blood, body fluid, or pathogen exposure. For some interactions ... only gloves may be needed; during other interactions ... use of gloves, gown, and face shield or mask and goggles is necessary.” Ibid.
In his testimony, Hitesman expressed an understanding of these “standard precautions” promulgated by the CDC. Hitesman spe *47 cifically pointed out that the infection control policies governing New Jersey nursing-home facilities are also derived from state law. Significantly, the CDC Guideline for Isolation Precautions is explicitly incorporated into state law. N.J.A.C. 8:39-19.4(a) mandates that a long-term healthcare “facility shall develop, implement, comply with, and review ... written policies and procedures regarding infection prevention and control which are consistent with the most up-to-date Centers for Disease Control and Prevention publications, incorporated herein by reference, including, but not limited to ... Guidelines for Isolation Precautions in Hospitals.” (Emphasis added). Similarly, the CDC standard precautions are contained in guidelines developed by the New Jersey Department of Health and Senior Services, specifically the Guidelines for the Control of Respiratory Outbreaks in Long-Term Care and Other Institutional Settings 6-10 (Nov. 2011),[1] and the Guidelines for the Control of Gastroenteritis Outbreaks in Long-Term Care and Other Institutional Settings 5-8 (Nov. 2011).[2] Both of these sources also reference the CDC Guideline for Isolation Precautions.
The testimony quoted above belies the majority’s assertion that Hitesman failed to identify, or “briefly alluded to,” the CDC “standard precautions” as a source of law. Moreover, the majority’s constrained and ungenerous reading of the record is completely at odds with the standard to be applied at a motion to dismiss, a standard that gives Hitesman the benefit of the most favorable inferences from his testimony.
III.
A.
Without any support, the majority states that “the trial record is devoid of proof that would put the defendant on notice of any *48 CDC or state regulatory standard against which its conduct was to be assessed.” Ante at 41, 98 A.3d at 325. A nursing home facility, like Bridgeway, is presumed to know the law governing the control of infectious diseases, and once an applicable statute or regulation is brought to its attention, it should have no problem accessing the law online or in a library.
At the summary-judgment stage, the trial court identified and quoted the above federal and state sources of law on infection control. It thus “identif[ied] a statute, regulation, rule, or public policy that closely relates to the complained-of conduct.” See Dzwonar, supra, 177 N.J. at 463, 828 A.2d 893. And, it made “a threshold determination that there [was] a substantial nexus between the complained-of conduct and a law or public policy.” See id. at 464, 828 A.2d 893. The trial court made the “substantial nexus” decision in favor of Hitesman and memorialized this decision in a thorough and detailed written summary-judgment opinion.
In that opinion, the court identified the sources of law and public policy concerning Hitesman’s “improper quality of patient care” allegations under N.J.S.A. 34:19-3(a)(l) and (e)(1), and his “clear mandate of public policy” allegations under N.J.S.A. 34:19— 3(e)(3). It cited Section 3.5 of the American Nursing Association (ANA) Code of Ethics, as well as “myriad statutes and regulations applicable to [Bridgeway]’s standard of care.” These regulations included all of the sources identified above, particularly the CDC Guideline for Isolation Precautions, N.J.A.C. 8:39-19.4 (mandating “general policies and procedures for infection control,” including compliance with CDC guidelines in long-term care facilities), and the Department of Health and Senior Services guidelines on infection control.[3] The trial court specifically noted that Hitesman brought to its attention the Health and Senior Services guidelines.
*49 After Hitesman presented his case, Bridgeway challenged both the trial court’s “substantial nexus” determination and the sufficiency of the trial evidence in a motion for involuntary dismissal. Addressing the “substantial nexus” issue, the court explained that it would not revisit its earlier summary-judgment opinion in which it identified the applicable sources of law. The court observed that the parties “had extensive argument on the summary judgment motions as to the law that applies to this case” and that “it was [the court’s] responsibility to identify what law may apply.” Indeed, the court specifically expressed that it had “established what the laws/policies/regulations are.”
Then, the trial court gave its reasons for denying the involuntary-dismissal motion. The court acknowledged that defendant believed that the evidence was “weighted substantially in [their] favor.” However, the court maintained that in deciding the motion it was not to assess whether “the weight” of the evidence favored defendant but rather whether there was “any evidence that could go to the jury.” The court noted that “we’ve heard the testimony of the plaintiff.”
B.
The trial court clearly understood its obligations under CEPA and Rule 4:37-2(b) at the involuntary-dismissal stage. See Dzwonar, supra, 177 N.J. at 464, 828 A.2d 893 (“If the trial court ... finds [a substantial nexus], the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable.”). The court did nothing more remarkable than apply the standard governing a dismissal motion, assessing the evidence and the legitimate inferences drawn from the record in allowing the case to go to the jury.
*50 Nevertheless, with blinders on, the majority refuses to accept the permissive standard that applies in a motion for involuntary dismissal. The majority pretends that Hitesman did not testify about the CDC standard precautions and that the only cited authorities present at the time of the involuntary-dismissal motion were the ANA Code of Ethics, Bridgeway’s Employee Handbook, and Bridgeway’s Statement of Resident Rights. Again, the record says otherwise.
C.
In addressing the merits of whether the trial court properly denied defendant’s involuntary-dismissal motion, the majority posits that Hitesman’s proposed jury instructions were inadequate because they failed to cite the CDC guidelines on “standard precautions” for infection control. See ante at 40-42, 93 A.3d at 325-26. However, whether jury instructions are adequate is a completely separate issue from whether a motion to dismiss should be granted. The trial court understood this distinction, and said so. In denying the dismissal motion, the court referenced the applicable law that it detailed in its summary-judgment opinion — the CDC guidelines and state law incorporating those guidelines. Any inadequacy in the jury charge is a matter that should have been separately addressed.
In summary, the trial court followed the framework articulated in Dzwonar, swpra, 177 N.J. at 464, 828 A.2d 893, and correctly applied Rule 4:37-2(b) to the trial record. I fail to see how the majority can conclude that Hitesman’s CEPA claims should have been dismissed.
IV.
Additionally, I disagree with the majority’s supposition that the ANA Code of Ethics has no applicability to Bridgeway as a healthcare facility. See ante at 37, 93 A.3d at 323. Inasmuch as Bridgeway acts through its employees, some of whom are nurses, *51 the ANA Code of Ethics has applicability to Bridgeway under CEPA.
The majority makes much of the point that Hitesman on cross-examination made a concession that the ANA Code of Ethics did not apply to Bridgeway. Ante at 21, 37, 93 A.3d at 313, 323. That a skilled defense attorney elicited from Hitesman an incorrect opinion on the law — that the ANA Code of Ethics did not apply to Bridgeway — does not alter the law.
An “employer” is defined broadly in CEPA to include “any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer’s consent.” N.J.S.A. 34:19-2(a). Thus, “employer” encompasses any individuals working on behalf of Bridgeway, including nurses. The ANA Code of Ethics clearly applies to nurses, including Hitesman, who worked in the Bridgeway facility on Bridgeway’s behalf. Surely, an employee who claims that other employees are violating their professional ethical mandates is engaged in activity protected by CEPA.
Therefore, the ANA Code of Ethics could reasonably form part of the basis for Hitesman’s whistleblowing activity. If Hitesman reasonably believed that not reporting improper quality of patient care in the Bridgeway facility would be a violation of the ANA Code of Ethics, then Hitesman was engaged in protected activity. In the context of this case, however, the ANA Code of Ethics is only meaningful in light of the CDC “standard precautions” for infection control.
V.
In conclusion, looking at the record in the light most favorable to Hitesman, sufficient evidence was presented to overcome Bridgeway’s motion to dismiss. For that reason, there is no basis to reverse the trial court’s decision to let this case go to the jury. Because the majority has failed to adhere to the deferential *52 standard of review applicable to involuntary-dismissal motions, I respectfully dissent.
For affirmance — Chief Justice RABNER and Justices LaVECCHIA, PATTERSON, and Judges RODRÍGUEZ (temporarily assigned) and CUFF (temporarily assigned) — 5.
For reversal — Justice ALBIN — 1.

 Available at http://www.state.nj.us/health/ilu/documents/outbreak_prevention. pdf.

 Available at http://www.state.nj.us/health/cd/nianual/gi_ltc.pdf.

 The trial court also referenced N.J.S.A. 26:2H-93 (declaring that "[i]t is in the public interest of this State for its nursing home industry to continue to provide high-quality services to those frail and vulnerable citizens who critically need *49 nursing home care”), and 42 C.F.R. § 483.25 (“Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being....”).